WiiitakeR, Judge,
delivered the opinion of the court:
• These two cases, in which plaintiffs are seeking to recover for the taking of easements of flight for defendant’s jet aircraft over their respective properties, are before us on the findings of fact and recommendations for conclusions of law of Trial Commissioner Mastin G. White, supported by an opinion, which are hereinafter set forth.
■ The Trial Commissioner’s opinion in this case was written before the Supreme Court’s opinion in Griggs v. Allegheny County, 369 U.S. 84. Prior thereto this court and the Supreme Court had held that the United States was liable, under certain circumstances, for the taking of an easement of flight over property by its planes in landing and taking off from an airport. Following those decisions, the Trial Commissioner concluded that the United States had not taken an easement of flight over certain parcels of land owned by some of the plaintiffs in this case prior to the time Air Force pilots first began flying jet planes over the properties with the intention of continuing to do so at will. When Air Force pilots did begin flying over their property, he said there was a taking by the United States. That date he fixed as about August 1, 1953.
However, in Griggs v. Allegheny County, supra, the Supreme Court, for the first time, held that the operator of an airport was liable, under certain circumstances, for the taking of an easement of flight over property necessary for the use of airplanes in landing and taking off from its airport. This holding makes it necessary for us to re-ex.amine the date of the taking, because the United States began the joint operation of this airport much before the Air Force pilots began flying planes over it. Prior thereto, and while the United States was jointly operating the airport, the *298 planes bad been flown by the pilots of the aircraft manufacturing companies.
As the Trial Commissioner found, and as he says in his opinion, on February 26, 1952, the United States took over joint operation of the airport with Los Angeles County, preliminary to its later complete acquisition of it on February 2, 1954. Pursuant to contracts entered into with the Air Force, aircraft manufacturing companies established and maintained at the airport plants for the manufacture of jet aircraft, and, beginning in February 1952, their pilots began making test flights of the planes being manufactured for the United States over some of the parcels of land involved in this case.
When the United States took over joint operation of the airport, it did so for the primary purpose of providing a place for the landing and taking off of the jet planes being manufactured for it on the airport grounds. It knew, of course, that these planes would fly over some of plaintiffs’ properties, and it intended that they should do so at whatever altitude take-offs and landings required. It turned out that the planes passed over the properties of some of the plaintiffs at altitudes of less than 500 feet, the lower reach of navigable air space over noncongested areas. This continued unabated from February 1952 to October 1956, when the number of these flights sharply decreased, but still continued thereafter to a greater or lesser extent.
When the flights commenced and it was ascertained that the planes passed over the properties at altitudes lower than the navigable air space, and defendant nevertheless continued the flights, it thereby manifested an intention to continue these trespasses on the air space below the navigable air space, which belonged to plaintiffs. But plaintiffs had no use for this air space, except as it contributed to their use and enjoyment of the surface of the ground, and except as it insured against an impairment of their use and enjoyment of the surface of the ground. So long as these flights did not seriously interfere with the use and enjoyment of their properties, the defendant did not impose a servitude upon them for which plaintiffs are entitled to compensation. *299 In our opinion this did not occur until August 1953 for the reasons now to be stated.
From the time the defendant took over joint operation of the airport in February 1952 until January of the following year, there was an average of 61 flights per month by jet aircraft. Beginning in January 1953 they increased to 132, and further increased to 352 by December of that year. Prior to August 1953 the flights were by pilots of the airplane companies who were manufacturing planes for defendant. Beginning in August 1953, Air Force pilots also flew the jet planes in and out of the airport, and from this time on the number of flights substantially increased. In 1954, they ranged from 296 to 675 per month; in 1955, from 523 to 721; and in 1956, from 489 to 1001.
The use and enjoyment of their properties by plaintiffs during 1952 could not have been substantially interfered with, since there was an average of only two flights a day over their properties. In January 1953, they increased to something over four a day, and by the end of the year they had increased to ten or twelve a day. We think that some time during 1953 there was substantial interference with plaintiffs’ use and enjoyment of their properties. The Trial Commissioner fixed August 1953 as the date of the taking, because at that time Air Force pilots began making test flights. We do not think this is determinative, but the record does not show substantial interference before that date, but it does show it thereafter. Hence, we see no reason to depart from the date fixed by the Trial Commissioner. Plaintiffs’ counsel in oral argument accepted that date as the one on which the statute of limitations began to run.
That was about 18 months after the defendant began joint operation of the airport, and after the flights had increased from something over two a day to about a dozen a day. Although later the flights greatly increased in number, by that time it seems to have been apparent that these flights were to continue for an indefinite time and in increasing volume, as the three manufacturing companies with plants on the airport grounds brought out more and more planes. With the advent of the Air Force pilots, plaintiffs then knew their use of their properties had been and would continue to be *300 seriously impaired by the flights of these planes. Before that time they were uncertain just how serious the impairment would be or how long- it would continue. Before that time we do not think the statute of limitations had begun to run and, hence, plaintiffs’ petitions are in time. Cf. United States v. Dickinson, 331 U.S. 745.
The Trial Commissioner has held that the owners of property over which planes flew at an elevation of less than 500 feet were entitled to compensation, but that they were not entitled to compensation for flights at 500 feet and above, although they may have been inconvenienced to some extent by these flights. Under the facts of this case, we think the Trial Commissioner’s holding was correct. The Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C. 171, as amended by the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C. 401, gave the United States “complete and exclusive national sovereignty in the air space” and granted to any citizen “a public right of freedom of transit in air commerce through the navigable air space of the United' States.” “Navigable air space” is defined as “air space above the minimum safe altitude of flight prescribed by the Civil Aeronautics Authority.” This Authority fixed these flights at 1,000 feet over congested areas and 500 feet over other areas. Hence, flights above 500 feet over noncongested areas are in the navigable air space in which there is “a public right of freedom of transit.” The public has a right to travel in this air space with the same freedom and the same immunity as it has to travel the public highways or navigable waters. Any incidental injury done to adjacent property that is “unavoidably attendant” upon use of any highway, whether on land, •or water, or in the air, is noncompensable. Matson v. United States, 145 Ct. Cl. 225; 171 F. Supp. 283; Richards v. Washington Terminal Co., 233 U.S. 546, 555; Campbell v. United States, 266 U.S. 368.
It is true that the inconvenience and annoyance experienced from the passage of a plane at 501 feet above a person’s property is hardly distinguishable from that experienced from the passage of a plane at, say, 490 feet, but the extent of a right-of-w7ay, whether on the ground or on water or in the air, has to be definitely fixed. Acts that are *301 permissible within the limits of the right-of-way are forbidden beyond its limits, and vice versa. Congress has fixed 500-feet as the lower limit of navigable air space; hence, what may be permissible above 500 ■ feet is forbidden below it, unless compensation is paid therefor.
This is not to say that a case could not arise where the unavoidable damage to a person’s property occasioned by travel in the navigable air space would be so severe as to amount to a practical destruction or a substantial impairment of it. When such a case arises we would then have to consider whether the relevant statutes and regulations violated the property owners’ constitutional rights; but plaintiffs have not made out such a case.
Plaintiffs’ contention in this case is that their properties were in a congested area, where the lower limits of the navigable air space is 1,000 feet. This is plainly untenable. The airport was located in the Mojave Desert. It was so located to get away from the congested areas. Many of the people living in the vicinity of the airport were attracted there by the airport itself, or by the manufacturing plants making planes for the United States. Quite a number of the residents had chicken ranches. Many of the plaintiffs in this case raised chickens on their lands. It was a sparsely settled community. The Trial Commissioner was right in holding that in this locality the air space above 500 feet was' in the public domain for the type of aircraft in use at that time.
We agree with the Trial Commissioner that only those property owners in the southwest approach zone to the southwest-northeast runway, whom he names, are entitled to recover, and that the other plaintiffs are not entitled to recover.
This leaves the question of the measure of damages. In a case of this sort that measure is the difference in the value of plaintiffs’ properties before the taking by the United States in August 1953 and their value after the full extent of the impairment of plaintiffs’ use and enjoyment of them became apparent. United States v. Dickinson, supra. This was some time between August 1953 and October 1956, when the use of this runway was largely discontinued in favor of the east-west runway.
*302 While since October 1956 this runway was used only occasionally, it seems apparent that defendant intends to use it at will for an indefinite period. We, therefore, agree with the Trial Commissioner that the defendant has taken a permanent easement of flight over the property of the named plaintiffs at altitudes of 400 feet and above.
The following plaintiffs in the Aaron case are entitled to recover:
Jack W. Clippinger and Irene Clippinger (9), Joseph B. Coburn and Sarah L. Coburn (10), Sidney S. Cog-burn and Bertha M. Cogburn (11), Clifford E. Dahl and Wanda L. Dahl (12), Ralph L. Fogg and Helen M. Fogg (15), Albert L. McGuire and Carmella R. McGuire (24), Raymond W. Morrett and Betty N. Morrett (26), John F. Morris, Jr., and Minnie Morris (27), and Clayton E. Smith and Delia A. Smith (33).
None of the plaintiffs in the Andersen case, and none of the plaintiffs in the Aaron case, except those named above, are entitled to recover and the petition as to them is dismissed.
The case is remanded to the Trial Commissioner to take proof on the amount of just compensation to which the above plaintiffs are entitled, determined in accordance with this opinion.
Davis, Judge; Duefee, Judge; LaRamoke, Judge; and J ONES, Chief Judge, concur.
OPINION OF THE COMMISSIONER

Introduction

At the suggestion of counsel for the parties and by order of the commissioner, these cases were tried jointly because they involve common questions of fact and law.
The plaintiffs in these cases assert claims based upon the ■alleged taking by the United States of avigation easements over their respective lands. The Aaron case involves 38 different parcels of land, and the Andersen case involves 15 different parcels of land.[1] All the parcels of land involved in these cases are located in the general vicinity of *303 an airport that was established by Los Angeles County, California, in an unincorporated community known as Palm-dale. Palmdale is situated within the Antelope Valley section of the Mojave Desert. The airport was operated by the County of Los Angeles for a number of years under the name of the Palmdale Airport.
As of 1942, three runways had been built at the Palmdale Airport: an east-west runway 5,225 feet long; a north-south runway 5,225 feet long; and a northeast-southwest runway 7,000 feet long. At that time, and for approximately 10 years thereafter, only propeller-type aircraft used the Palm-dale Airport for takeoffs and landings. The evidence in the record does not indicate that flights of such aircraft over the lands involved in the present cases interfered substantially with the use and enjoyment of such lands.
Following negotiations between the County of Los Angeles and the defendant relative to the acquisition of the Palmdale Airport by the defendant for the use of the Department of the Air Force, the Board of Supervisors of Los Angeles County on February 26, 1952, in anticipation of the ownership of the airport being subsequently transferred to the defendant, conferred upon the defendant a right of entry to utilize the facilities of the Palmdale Airport. From February 28, 1952, until May 1, 1953, the Palmdale Airport was operated jointly by the County of Los Angeles and the defendant. Since May 1, 1953, the airport has been operated by the defendant.
Title to the Palmdale Airport was formally transferred to the defendant by means of a deed which was executed on February 2,1954, by the County of Los Angeles. This deed conveyed to the defendant 4,552.07 acres of land for a consideration of $1,285,000. Additional acreage was acquired by the defendant after February 2, 1954, and added to the airport. The name of the facility was changed by the defendant to Air Force Plant No. 42.
The defendant, in August 1954, extended the northeast-southwest runway at Air Force Plant No. 42 to a total length of 12,000 feet by adding 5,000 feet of runway onto the northeast end of the original northeast-southwest runway. In October 1956, the defendant constructed a new east-west runway 12,000 feet in length.
*304 Aircraft companies engaged in the production of jet aircraft for the United States Air Force pursuant to contracts with the latter agency have established and maintained manufacturing plants at Air Force Plant No. 42 under agreements with the defendant. Beginning in February 1952 and continuing to the present time, the manufacturers have flight-tested such jet aircraft, prior to delivery to the Air Force, by flying the aircraft from and to Air Force Plant No. 42. During- the period February-December 1952, an average of approximately 61 flight-tests per month were made at Air Force Plant No. 42 by jet aircraft operated by company personnel.
Beginning as early as August 1953, at least, and continuing until the present time, jet aircraft produced by aircraft companies at Air Force Plant No. 42 for the Air Force have been flight-tested by Air Force personnel at Air Force Plant No. 42, prior to the acceptance of the aircraft by the Air Force. Flight-tests of such aircraft by company personnel have also continued throughout this period. Therefore, the flight-testing of jet aircraft at Air Force Plant No. 42, prior to the acceptance of the aircraft by the Air Force, has been conducted both by company personnel and by Air Force personnel at all times since August 1953, at least. '
In 1953 and thereafter, the úse of Air Force Plant Bo. 42 for the flight-testing of jet aircraft became more and moré frequent. The number of flight-tests per month that were made during the period 1953-1958 varied in 1953 from a low of 132 (January) to a high of 352 (December), in 1954 from a low of 296 (March) to a high of 675 (September)-, in 1955 from a low of 523 (November) to a high of 721 (June), in 1956 from a low of 489 (April) to a high of 1,001 (November), in 1957 from a low of 890 (February) to a high of 1,161 (August), and in 1958 from a low of 732 (December) to a high of 1,149 (October).[2]
*305 During the period since August 1953, at least, many flights by military jet aircraft, which already constituted equipment of the United States and which were operated by Government personnel, have been made to and from Air Force Plant No. 42. These flights have been in addition to the preacceptance test flights of jet aircraft previously referred to in the opinion. Statistical data are lacking with respect to the number, regularity, and frequency of the flights made to and from Air Force Plant No. 42 by jet aircraft that already constituted part of the defendant’s military equipment, but the inference is warranted that substantial numbers of such aircraft have used the runways of Air Force Plant No. 42 at frequent intervals since August 1953.

Southwestern Parcels

Of all the parcels involved in these cases, parcel 27 in the Aaron case is the one whose airspace has been most vulnerable to invasions by low-flying jet aircraft. This is because of the geographical location of the parcel and the relationship of that location to the history of the use by jet aircraft of the facilities at Air Force Plant No. 42. Perhaps it would be helpful, therefore, to discuss in some detail the problem of the defendant’s liability to the plaintiffs Raymond W. Mor-rett and Betty N. Morrett, owners of parcel 27 in the Aaron case.
Parcel 27 is situated approximately 8,000 feet southwest of the southwest end of the northeast-southwest runway at Air Force Plant No. 42, and it is in direct line with that runway. No other parcel in either case is located so close to the end of a runway and, at the same time, in direct line with the runway.
When jet aircraft first began to use the facilities at Air Force Plant No. 42 for takeoffs and landings in February 1952, and for several years thereafter, or until October 1956, the northeast-southwest runway was the one customarily used by such aircraft. This was due, first, to the fact that the prevailing wind in the Palmdale area is from the southwest and, second, to the fact that during the period February 1952-October 1956 the northeast-southwest runway was the longest runway at Air Force Plant No. 42. During this pe *306 riod, approximately 85 percent of the takeoffs by jet aircraft at Air Force Plant No. 42 were from the northeast-southwest runway toward the southwest, and approximately 15 percent of the takeoffs were from that runway toward the northeast.
At all times material to these cases, takeoffs from and landings at Air Force Plant No. 42 have been subject to flight regulations promulgated by the Air Force and its local representative at Air Force Plant No. 42. In the takeoff procedure prescribed under these regulations, a jet aircraft starts a takeoff roll from the downwind end of the runway, and utilizes anywhere from approximately 3,200 feet to approximately 5,000 feet of the runway for the takeoff roll, before becoming airborne.[3] When the use of the facilities of Air Force Plant No. 42 by jet aircraft was first begun in February 1952, the northeast-southwest runway was only 7,000 feet long. Therefore, a jet aircraft using the northeast-southwest runway for a takeoff toward the southwest in February 1952 became airborne when it was about 2 miles from, and proceeding at a high rate of speed toward, parcel 27 in the Aaron case.
The pertinent flight regulations have at all times required a jet aircraft using the northeast-southwest runway for a takeoff toward the southwest to gain altitude as rapidly as. possible and to make a right-hand turn upon attaining an altitude of 500 feet above the ground, in order to avoid, if possible, the residential area southwest of the runway.[4] However, at the time when the northeast-southwest runway was only 7,000 feet long, the altitude of 500 feet above the-ground for the right-hand turn was not reached until the-plane was over or beyond parcel 27.[5] Therefore, it must *307 be found that, beginning in February 1952, jet aircraft regularly and frequently flew over parcel 27 at altitudes of less than 500 feet. As the airspace over this parcel up to an altitude of 500 feet above the ground is not subject to the public right of freedom of air navigation (Matson v. United States, 145 Ct. Cl. 225 (1959)), the intrusions just mentioned by jet aircraft into such airspace amounted to wrongful interferences with the property rights of the landowner.
We have in this litigation the rather unusual situation of the defendant insisting that if jet aircraft actually did begin frequent invasions of the airspace over parcel 27 at altitudes of less than 500 feet above the ground in February 1952, the defendant was fully responsible for such invasions, whereas the plaintiffs insist that there was a complete lack of responsibility on the part of the defendant for such low-flying jet aircraft. There are two reasons for this seemingly anomalous situation. The first is that if an avigation easement over parcel 27 was taken by the United States in February 1952, when jet aircraft from Air Force Plant No. 42 first began to fly over parcel 27 at altitudes of less than 500 feet (Highland Park, Inc. v. United States, 142 Ct. Cl. 269, 273 (1958); Adaman Mutual Water Co. v. United States, 143 Ct. Cl. 921, 924 (1958); Matson v. United States, supra, at p. 229; cf. Klein v. United States, 152 Ct. Cl. 221 (1961), on motion for reconsideration, cert, denied 366 U.S. 936), the claim for the taking of such an easement was barred by the applicable 6-year statute of limitations (28 U.S.C. 2501) at the time when the petition in the Aaron case was filed on November 3, 1958. The second reason for the seemingly anomalous position of the parties with respect to the point now under consideration is that parcel 27 was not owned by the plaintiffs Raymond W. and Betty N. Morrett in February 1952 and, therefore, these plaintiffs would have no standing to assert a claim with respect to the taking of an avigation easement over this parcel in February 1952, since such a claim would have vested in the owner of the land at that time and would not have passed to Mr. and Mrs. Morrett *308 by virtue of the subsequent conveyance of parcel 27 to them. United States v. Dow, 357 U.S. 17, 20-21 (1958); Ferrell v. United States, 49 Ct. Cl. 222, 224 (1914); see Highland Park, Ine. v. United States, supra, at p. 273.
The jet aircraft that began to fly at low altitudes over parcel 27 in February 1952 had been manufactured for the Air Force under contracts between aircraft companies and the United States. However, such aircraft were being test-flown by the manufacturers’ personnel prior to the delivery of such aircraft to, and their acceptance by, the Air Force. Since the jet aircraft did not yet constitute part of the military equipment of the United States, and since the pilots operating such aircraft were not agents or personnel of the United States, I do not believe that the Government could properly be held liable for low flights by the aircraft over parcel 27.
Technically, legal title to the aircraft mentioned in. the preceding paragraph was vested in the United States during the process of manufacture and thereafter. However, this ownership of the legal title surely did not make the United States liable for torts committed by the manufacturers’ employees while working on or test-flying the aircraft prior to the time when the aircraft were delivered to and accepted by the Air Force.
The preacceptance flight-tests of jet aircraft at Air Force Plant No. 42 continued to be made exclusively by employees of the manufacturing companies throughout 1952 and into 1953. However, beginning as early as August 1953, at least, Air Force personnel began to make flight-tests of jet aircraft at Air Force Plant No. 42 prior to the acceptance of such aircraft by the Air Force. Since that time, preacceptance flight-tests of jet aircraft at Air Force Plant No. 42 have been made both by company personnel and by Air Force personnel. Furthermore, during the period since August 1953, at least, many flights by military jet aircraft, which already constituted Government equipment and which were operated by personnel of the United States, have been made to and from Air Force Plant No. 42. The flights mentioned in the preceding sentence have been in addition to the preacceptance flight-tests of jet aircraft referred to heretofore.
*309 For a period of approximately a year after Government personnel began to conduct preacceptance flight-tests of jet aircraft at Air Force Plant No. 42 and to fly military jet aircraft to and from that facility, the original 7,000-foot northeast-southwest runway continued to be the one customarily used for takeoffs and landings by jet aircraft, and approximately 85 percent of the takeoffs were toward the southwest. Therefore, it must be concluded, for the reasons previously mentioned, that during this period of approximately a year the United States was responsible for many invasions of the airspace over parcel 27 at altitudes less than 500 feet above the ground by jet aircraft operated by Government personnel during the takeoff procedure. Neither the evidence introduced by the plaintiffs nor that introduced by the defendant indicates the exact elevations at which these low flights were made. The plaintiff Eaymond W. Morrett merely testified (in response to leading questions) that flights were made over parcel 27 “at elevations below 500 feet” or “under 500 feet.”
On the basis of the evidence in the whole record, I believe that a finding is justified to the effect that during the period August 1953-August 1954 frequent flights by jet aircraft at elevations as low as 400 feet above the ground were made over parcel 27 in accordance with the prescribed flight regulations, that many of these aircraft were operated by Government personnel, and that many of the aircraft operated by Government personnel were military equipment of the United States. According to the plaintiff Eaymond W. Mor-rett, the vibrations from these low flights shook the dwelling on the property, and the noise from them interfered with television reception, made it impossible to use the telephone or to conduct a conversation, and caused his chickens to “pile up” in a bam on the premises Apparently, so far as this record shows, there was no-differentiation in these consequences between low flights by jet aircraft operated by Government personnel, on the one hand, and low flights operated by company personnel, on the other hand. However, the direct, immediate, and’ substantial interferences with the use and enjoyment of the land as a result of frequent flights by Government-manned jet aircraft over the *310 land at an altitude of 400 feet above the ground amounted to the taking of an easement of flight over parcel 27 by the Government. United States v. Causby, 328 U.S. 256, 266 (1946). The United States cannot escape liability for the taking merely because the aircraft companies were also invading the airspace over parcel 27 at an equally low altitude.
In August 1954, the northeast-southwest runway at Air Force Plant No. 42 was extended to a total length of 12,000 feet by adding 5,000 feet of runway onto the northeast end of the original runway. Thereafter, for a period of more than 2 years, or until October 1956, approximately 85 percent of the takeoffs by jet aircraft continued to be made from the northeast-southwest runway toward the southwest. However, during this period from August 1954 until October 1956, jet aircraft taking off from the northeast-southwest-runway toward the southwest became airborne approximately 3 miles northeast of parcel 27; and, under the prescribed flight regulations, they were required to reach an altitude of 500 feet above the ground and to make a right-hand turn at a point northeast of parcel 27. In the case of a plane flying a special mission, it might be granted permission, as an exception to the prescribed takeoff pattern,, to proceed on toward the southwest without making a right-hand turn upon reaching the 500-foot elevation; and, in that event, the plane would doubtless fly over parcel 27, but at an altitude somewhat above the 500-foot minimum.
It appears, therefore, that the United States has not caused jet aircraft taking off toward the southwest from the northeast-southwest runway to make frequent flights at low altitudes over parcel 27 during the period since August 1954.. In this connection, it is pertinent to note that after the completion of the new east-west runway in October 1956, the-northeast-southwest runway has not been used regularly for takeoffs by j et aircraft toward the southwest. Since October-1956, approximately 85 percent of the takeoffs by jet aircraft at Air Force Plant No. 42 have been from the new east-west-runway toward the west, and approximately 15 percent of the takeoffs by such aircraft have been from the northeast-southwest runway toward the northeast.
*311 . We turn now to a study of the relationship of parcel 27 to the prescribed flight patterns relating to landings by jet aircraft at Air Force Plant No. 42.
During the period from February 1952 until October 1956, the northeast-southwest runway was the one customarily used by jet aircraft for landings at Air Force Plant No. 42, and approximately 15 percent of the landings during this period were made onto the northeast-southwest runway from the southwest. The applicable flight regulations governing landings from the southwest onto the northeast-southwest runway during the period mentioned (and at all other times material to this litigation) established a landing pattern that began at a point 3 to 5 miles southwest of (i.e., downwind from) the southwest end of the northeast-southwest runway. At that point, the aircraft was required to be at- an altitude of about 1,500 feet above the ground, and it was flying at a speed of approximately 300 knots per hour. In accordance with the prescribed pattern, the aircraft proceeded northeast in line with the runway at an altitude of 1,500 feet above the ground, passing over parcel 27. When the aircraft reached a point above the southwest end of the runway, the power was reduced and the plane was put into a left turn in order to fly an elliptical course that would ultimately bring it back in line with the runway for a landing near the southwest end of the runway. The aircraft maintained its altitude of about 1,500 feet above the ground while flying away from the runway during the first stage of the elliptical course, and also while flying a downwind leg more or less parallel to the runway during the second stage of the elliptical course. The altitude of the aircraft was reduced gradually during the later stages of the elliptical course, so that the plane was at an altitude of approximately 500 feet above the ground when it made the final turn in order to line up with the runway for a landing. When the process of lining up with the runway was completed, the aircraft was flying at an altitude of about 300 feet above the ground. The aircraft then proceeded to the point of touchdown a short distance northeast of the southwest end of the runway.
A study of all the evidence leads me to conclude that many jet aircraft, during the process of letting down from an elevation of 500 feet above the ground to an elevation of *312 300 feet above the ground while lining up with the northeast-southwest runway preparatory to landing onto that runway from the southwest, passed over parcel 27 at an altitude as low as 400 feet above the ground. In so far as such aircraft were piloted by Government personnel after about August 1953, they contributed to the taking of an easement of flight by the Government over parcel 27, as previously described.
The regular use of the northeast-southwest runway for landings from the southwest by approximately 15 percent of the jet aircraft using the facilities at Air Force Plant No. 42 continued until October 1956. After the completion of the new east-west runway in October 1956, the northeast-southwest runway has not been used frequently or regularly for landings by jet aircraft from the southwest.
Therefore, we have in this litigation a situation where the Government took an easement of flight over parcel 27 at an altitude of 400 feet above the ground in about August 1953, but Government personnel ceased to make frequent flights over this parcel at low altitudes (i.e., less than 500 feet above the ground) in about October 1956. In determining whether an easement of flight is taken temporarily or permanently (United States v. Causby, supra, at p. 268), the important factor seems to be the intention of the Government at the time when it first causes jet aircraft to fly over the land at low altitudes. Highland Park, Inc. v. United States, supra, at p. 273. There is nothing in the evidence to indicate that the Government, when its personnel first began to make frequent .flights in jet aircraft at low altitudes over parcel .27 in about August 1953, intended that such low flights would be discontinued at some time in the future. On the contrary, it seems reasonable to infer that the intention at the time was to continue to exercise the right for an indefinite period. Therefore, it is my opinion that a permanent easement of flight over parcel 27 was taken by the United States in about August 1953.
As indicated earlier in the opinion, the claim for the taking of an avigation easement by the United States vests in the owner of the land at the time of the taking; and the •claim does not pass with the land in the event that the latter .. is subsequently conveyed to someone else. United States *313 v. Dow, supra, at pp. 20-21; Ferrell v. United States, supra, at p. 224. In August 1953, when an avigation easement was taken over parcel 27, Mr. and Mrs. Morrett were in possession of parcel 27 under a written contract for the purchase of this property at a fixed price. The contract had beefi entered into by Mr. and Mrs. Morrett on October 10, 1952, with the former owners of parcel 27; and the Morretts had taken possession of the property shortly thereafter. Mr. and Mrs. Morrett lived in a trailer at first, and then built a house. The deed formally conveying the legal title to Mr. and Mrs. Morrett was not executed by the former owners until August 23, 1957, which was several years after the taking of the avigation easement over parcel 27 by the United States.
After Mr. and Mrs. Morrett took possession of parcel 27 in the fall of 1952 under the contract of purchase, they were regarded by California law as the owners of the land for all practical purposes. Elliott v. McCombs, 109 P. 2d 329, 334 (Calif., 1941); Sherman v. Quinn, 192 P. 2d 17, 19 (Calif., 1948). Therefore, the ownership of the claim against the United States for the taking of an avigation easement over parcel 27 in August 1953 vested in Mr. and Mrs. Morrett as the equitable owners of parcel 27 at the time; and they are entitled to maintain the present action for just compensation. 23 Tracts of Land v. United States, 177 F. 2d 967, 970 (6th Cir., 1949).
Compensation for the taking of an easement by the Government must be determined as of the time and place of the taking. United States v. Dow, supra, at p. 20; Potts v. United States, 130 Ct. Cl. 88, 94 (1954). The measure of damages in such a situation is the difference between the fair market value of the land just before the easement was taken and the fair market value just after the easement was taken. Federal Real Estate and Storage Co. v. United States, 79 Ct. Cl. 667, 682 (1934); Karlson v. United States, 82 F. 2d 330, 337 (8th Cir., 1936).
The evidence in the present record is not sufficient to permit a determination to be made regarding the extent of the damages sustained by Mr. and Mrs. Morrett as a result of the taking by the United States of an easement of flight over *314 parcel 27 in about August 1953. An appraiser testifying on behalf of the plaintiffs expressed the opinion that parcel 27 had a fair market value of $24,823 on or about July 1,1953, and that the value of this property shortly after July 1,1953, was $16,135. However, this appraiser assumed, in connection with the first valuation, that parcel 27 was not at the time affected by low flights of jet aircraft, whereas the evidence shows that the parcel had been subjected for about iy2 years before July 1, 1953, to low flights of jet aircraft operated by aircraft company personnel. Moreover, the plaintiffs’ appraiser assumed, in connection with the second valuation, that the United States had taken an easement of flight over this property at an altitude of 150 feet above the ground, whereas the evidence does not show the taking of an easement in the airspace below an altitude of about 400 feet above the ground.
An appraiser testifying on behalf of the defendant expressed the opinion that as of July 1, 1953, the fair market value of parcel 27 was $20,000, and that this parcel continued to have the same value thereafter. However, this appraiser erroneously assumed that no flights of jet aircraft were made over parcel 27 at any time below the 500-foot level.
It appears, therefore, that the extent of the recovery by Mr. and Mrs. Morrett must be determined in subsequent proceedings under Rule 38(c).
. In addition to parcel 27, previously discussed, the parcels in the Aaron case numbered 8, 10, 11, 12, 13, 16, 25, 28, 31, 34, and 36 are all located in the approach zone to the southwest end of the northeast-southwest runway at Air Force Plant No. 42.[6] The distances of these parcels from the southwest end of the runway vary from approximately 8,000 feet to approximately 11,000 feet.
Ernest C. Carpenter, allegedly the owner of parcel 8 in the Aaron case with his wife, Flosse Carpenter, died between the filing of the petition and the holding of the trial. No other party has been substituted for him.
No testimony was offered at the trial with respect to the *315 alleged taking of an avigation easement over parcel 36 in the Aaron case.
Of all the parcels previously mentioned as being in the approach zone to the southwest end of the northeast-southwest runway, parcel 31 in the Aaron case is the most distant from the end of the runway. There is in the record hearsay testimony to the effect that tenants living on this property complained about the noise from low-flying jet aircraft. However, the evidence is not sufficient to justify a finding that an easement of flight at an elevation of less than 500 feet above the ground has been taken by the United States over this property.
Owner-occupants of parcels 10, 11, 12, 13, 16, 25, 28, and 34 in the Aaron case testified at the trial regarding frequent flights by jet aircraft at low elevations (i.e., less than 500 feet above the ground) over their lands. Although the circumstantial evidence supporting this testimony is not as persuasive as that previously mentioned in connection with parcel 27,1 believe that the testimony of these persons is sufficient to justify the court in finding that permanent easements of flight over their lands were taken by the United States in about August 1953. In particular, it may be noted that the airspace over parcels 10, 11, and 25 has been especially vulnerable to invasions by low-flying jet aircraft engaged in the process of landing from the southwest onto the northeast-southwest runway.
The extent of the recovery by the owners of the parcels mentioned in the preceding paragraph must be determined in subsequent proceedings under Rule 38(c), because of the inadequacy of the proof on this point in the present, record.
Parcels 21, 22, and 38 in the Aaron case, and parcel 13 in the Andersen case, are located outside but near the approach 'zone to the southwest end of the northeast-southwest runway. The owner-occupant of parcel 21 in the Aaron case gave affirmative answers to leading questions as to whether the United States'had “flown any jet airplanes which went over your house,” and whether “any of them * * * have been at elevations of less than 500 feet * * * above the ground.” Such testimony, standing alone, is not persuasive, particularly in view of the difficulty of accurately estimating, from the ground, the altitude of fast-flying jet aircraft. *316 Furthermore, any flights that were made by jet aircraft over parcel 21 (or over parcels 22 and 38) at altitudes of less than 500 feet violated the flight regulations prescribed by the United States to govern flights from, to, and hi the vicinity of Air Force Plant No. 42. In my opinion, such flights would not constitute a taking by the United States of an easement of flight over the property, within the meaning of the eminent domain provision of the Fifth Amendment to the Constitution.

Northeastern Parcel

Parcel 4 in the Aaron case is located in the approach zone to the northeast end of the northeast-southwest runway at Air Force Plant No. 42. Its location was more than 17,000 feet from the end of the runway during the period February 1952-August 1954; and this parcel is more than 12,000 feet from the end of the runway as extended in August 1954.
No evidence was introduced at the trial with respect to low flights by jet aircraft over this parcel.

Western Parcels

Parcels 1, 2, 3, 6, 7,15, 17,18, 19, 20, 23, 24, 26, 29, 30, 35, and 37 in the Aaron case, and parcels 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 14, 15, and 16 in the Andersen case, are located in the approach zone to the west end of the new east-west runway at Air Force Plant No. 42.[7] Parcel 9 in the Andersen case, which is closer to the end of the runway than any of the other parcels mentioned in this paragraph, is approximately 10,000 feet from the west end of the new east-west runway.
Testimony was given at the trial regarding frequent flights by jet aircraft over many of these parcels at altitudes of less than 500 feet above the ground. The great majority of the witnesses whose occupancy of parcels in this area extended back that far testified that such flights began in 1953 or 1954.
In 1953 and 1954, the jet aircraft that operated from Air Force Plant No. 42 were using the northeast-southwest runway for takeoffs and landings. The parcels mentioned in this part of the opinion are located several miles from the *317 northeast-southwest runway; they are not in line with that runway; and they have never been affected by the patterns prescribed by the flight regulations to govern aircraft taking off from or landing on the northeast-southwest runway.
The evidence in the record indicates that many jet aircraft were flying in the area around Air Force Plant No. 42 during the period 1953-1954, and it is reasonable to assume that cruising aircraft frequently flew over the parcels in the western area. However, the regulations governing flights in the vicinity of Air Force Plant No. 42 have at all times required aircraft to fly at altitudes higher than 500 feet above the ground, except during the initial stage of the takeoff procedure and the final stage of the landing procedure. Furthermore, concern for the enforcement of this requirement was consistently manifested by the responsible Government officers. On the basis of all the evidence in the record, there seems to be a reasonable likelihood that the persons who testified regarding flights by jet aircraft over these parcels in 1953 and 1954 at altitudes below 500 feet above the ground misjudged the actual altitudes of the aircraft. If, however, some jet aircraft actually did fly over these parcels during the period 1953-1954 at altitudes of less than 500 feet above the ground, such flights constituted violations of the applicable flight regulations and could not, in my opinion, constitute a taking by the Government of an easement of flight under the eminent domain provision of the Fifth Amendment to the Constitution.
The situation with respect to the parcels in the western area changed substantially with the completion of the new east-west runway at Air Force Plant No. 42 in October 1956. After that time, approximately 15 percent of the landings by jet aircraft at Air Force Plant No. 42 were from the west onto the new east-west runway, and approximately 85 percent of the takeoffs by jet aircraft at Air Force Plant No. 42 were from the new east-west runway toward the west.
After the completion of the new east-west runway, every jet aircraft that landed onto that runway from the west passed over some of the parcels in the western area, but I do not believe that the evidence warrants a finding that such flights were at altitudes of less than 500 feet. The flight *318 regulations governing these landings established a landing pattern that began at a point from 3 to 5 miles west of (i.e., downwind from) the west end of the east-west runway. At that point, the plane was required to be at an altitude of about 1,500 feet above the ground, and it was required to proceed eastward at that elevation in line with the runway until it reached a point above the west end of the new east-west runway. It was during the stage of the landing pattern mentioned in the preceding sentence that the aircraft passed over parcels located in the western area. Upon reaching the west end of the new east-west runway, power was then reduced, and the plane was put into a left turn in order to fly an elliptical course that would ultimately bring it back for a landing near the west end of the runway. The elevation of the plane was reduced gradually from an altitude of about 1,500 feet above the ground during the later stages of the elliptical course. ■ However, while flying the elliptical course, the aircraft did not again pass over the parcels in the western area.
In connection with takeoffs from the new east-west runway toward the west, the applicable flight regulations required that the takeoff roll begin near the east end of this 12,000-foot runway. The takeoff roll by a jet aircraft required anywhere from a minimum of approximately 3,200 feet to a maximum of approximately 5,000 feet of the runway. Therefore, the jet aircraft would become airborne at a point more than 3 miles east of the nearest parcel in the western area. The aircraft was required by the prescribed flight regulations to gain altitude as rapidly as possible and, upon attaining an altitude of 500 feet above the ground, to make a right-hand turn in order to avoid the residential area situated west of the runway. The evidence indicates that the 500-foot altitude would be reached and the right-hand turn would be made at a point some distance east of the nearest parcel in the western area.
There were occasions when jet aircraft taking off on special missions from the new east-west runway toward the west were permitted, after reaching the 500-foot altitude, to proceed toward the west or to make a left-hand turn, instead of making a right-hand turn. However, it appears that such *319 aircraft were more than 500 feet above the ground when they passed over parcels situated in the western area.
Although I do not believe that the evidence in the record would justify findings that the United States caused jet aircraft to make frequent flights over parcels in the western area at altitudes of less than 500 feet above the ground, the evidence does show that the occupants of parcels in that area were disturbed by the flights that occurred over the parcels at altitudes somewhat higher than 500 feet. This was particularly true with respect to flights by heavy jet bombers which were engaged in special training missions and which, from time to time beginning in the early part of 1957, flew over parcels in the western area on takeoffs from the new east-west runway toward the west. However, the airspace over these parcels, beginning at an elevation of 500 feet above the ground, is part of the public domain and is subject to a public right of freedom of air navigation. See United States v. Causby, supra, at p. 266; Matson v. United States, supra, at pp. 227-228. (See the discussion under the heading “Eastern Parcels” for further information regarding flights by these heavy jet bombers.)
For the reasons previously indicated, I do not believe that the United States is liable for the taking of avigation easements over the parcels situated in the western area.

Eastern Parcels

Parcels 5, 9, 14, and 33 in the Aaron case are located wholly or partially in the approach zone to the east end of the new east-west runway at Air Force Plant No. 42. Parcel 32 in the Aaron case is located outside but near the approach zone to the east end of this runway. Only one of the parcels mentioned in this paragraph is located in direct line with the runway. This is parcel 33, which is located approximately 10,000 feet from the east end of the new east-west runway.
Since the completion of the new east-west runway in October 1956, this runway has been principally used for takeoffs by jet aircraft toward the west. Of course, parcels in the eastern area have not been affected by ordinary takeoffs toward the west, since the takeoff roll in such a situation *320 begins at the east end of the runway and proceeds toward the west.
The eastern parcels have been affected, however, since the early part of 1957 by the use of the new east-west runway for touch-and-go landings and takeoffs by heavy jet bombers. These bombers, when practicing touch-and-go landings and takeoffs, have generally used the new east-west runway for that purpose. Such a bomber lands from the east onto the new east-west runway, and immediately takes off toward the west after touching down briefly on the runway. Then, after attaining an altitude of at least 500 feet above the ground, the bomber turns and flies an elliptical course— most frequently to the right, but sometimes to the left — in order to get in position for another touch-and-go landing and takeoff. Upon completing a series of touch-and-go landings and takeoffs, a heavy jet bomber departs from Air Force Plant No. 42 to its home base or some other airport. During the maneuvers described in this paragraph, heavy jet bombers have frequently flown over parcels in the eastern area (and also over parcels in the western area when flying an elliptical course to the left or departing from Air Force Plant No. 42 after the final touchdown and takeoff). However, the evidence in the record does not warrant a finding that the heavy jet bombers have frequently passed over these parcels at altitudes of less than 500 feet above the ground. Even at an altitude somewhat higher than 500 feet above the ground, the noise made by the engines of a heavy jet bomber is disturbing to persons on the ground, as such noise interferes with conversation, either on the telephone or person-to-person, and it interferes with radio and television reception. In addition, the passage of a heavy jet bomber through the air at an altitude somewhat above the 500-foot level causes vibrations that affect buildings on the ground and their contents. The courts have indicated, though, that the airspace beginning at the 500-foot level above the ground is in the public domain and may be used by aircraft without liability to the subjacent landowners. See United States v. Causby, supra, at p. 266; Matson v. United States, supra, at pp. 228-229.
. The evidence indicates that the new east-west runway has been used, at least occasionally, for takeoffs by jet aircraft *321 toward the east, and for landings by jet aircraft from the east (in addition to the practice touch-and-go landings by heavy jet bombers previously mentioned). However, .the pattern prescribed by the applicable flight regulations for such takeoffs toward the east require the aircraft to attain an altitude of 500 feet above the ground and to make a left-hand turn at a point considerably to the west of the nearest parcel in the eastern area. The pattern prescribed for landings from the east onto the new east-west runway call for the aircraft to pass over parcel 33 on the initial approach, but that passage is at an elevation of about 1,500 feet above the ground. Although this landing pattern calls for the aircraft, while flying the customary elliptical course to the left, to pass over parcel 9, and perhaps over parcel 14 or parcel 33 or both, the aircraft is required to be more than 500 feet above the ground during the stage of the elliptical course that involves these parcels.
The parcels in the eastern area are also involved in some landings by jet aircraft onto the northeast-southwest runway from the northeast. At all times material to this litigation, approximately 85 percent of the landings by jet aircraft at Air Force Plant No. 42 have been from the northeast onto the northeast-southwest runway. Beginning in 1953, and thereafter, the great majority of these landings have utilized an instrument landing system (ILS); and aircraft utilizing that system have not passed over any of the parcels in the eastern area during'the landing procedure. On the other hand, some of the landings by jet aircraft onto the northeast-southwest runway from the northeast have not utilized the ILS. The landing pattern prescribed by the flight regulations for these landings is similar to the landing patterns described in other portions of this opinion. This particular landing pattern begins at a point from 3 to 5 miles northeast of (i.e., downwind from) the northeast end of the northeast-southwest runway, and at that point the plane is at an elevation of about 1,500 feet above the ground. The plane proceeds toward the southwest at that elevation until it reaches the northeast end of the runway, where it makes a left-hand turn in order to fly an elliptical course that will ultimately bring it back in line with the runway for the touchdown. The left-hand elliptical course, after the extension of the *322 northeast-southwest runway in August 1954, has necessarily taken the aircraft oyer parcels located in the eastern area. However, an aircraft engaged in this landing pattern does not pass over- any of the parcels in the eastern area at an altitude of less than 500 feet above the ground.
For the reasons indicated in this part of the opinion, I do not believe that there has been a taking of an avigation easement by the United States over any of the parcels located in the eastern area.
FINDINGS OF FACT
1. Originally, 37 parties plaintiff and (except for four unmarried parties) their respective spouses, owning parcels of land identified as parcels 1 through 38, inclusive, were parties to the Aaron case; and 16 parties plaintiff and (except for three unmarried parties) their respective spouses, owning parcels of land identified as parcels 1 through 16, inclusive, were parties to the Andersen case.
2. Ernest C. Carpenter, allegedly the owner of parcel 8 in the Aaron case with his wife, Flosse Carpenter, died during the pendency of this litigation. No other party has been substituted in his behalf.
3. The claim of Leroy J. Miller and Bernalda I. Miller, allegedly the owners of parcel 10 in the Andersen case, was withdrawn during the trial, and the petition was dismissed as to them.
4. All of the parcels of land involved in these cases are located in the general vicinity of an airport that was originally established by the County of Los Angeles, California, in an unincorporated community known as Palmdale. Palm-dale is situated within the Antelope Valley section of the Mojave Desert. The airport was operated by the County of Los Angeles for a number of years as a county airport under the name of the Palmdale Airport. As of 1942, three runways had been built at the Palmdale Airport: an east-west runway 5,225 feet long; a north-south runway 5,225 feet long; and a northeast-southwest runway 7,000 feet long. At that time, and for approximately 10 years thereafter, only propeller-type aircraft used the Palmdale Airport for takeoffs and landings. The evidence in the record does not *323 indicate that flights of such aircraft over the lands involved in the present cases interfered substantially with the use and enjoyment of such lands.
,5. (a) Under the date of July 25,1951, the Director of the Department of Aviation, Los Angeles County, wrote to the Board of Supervisors of that county a letter stating as follows:
Negotiations are being consummated for the leasing of large parcels of land at the Los' Angeles. County Palmdale Airport to several major aircraft industries, which contemplate building plants for the assembly and testing of jet aircraft. These negotiations involve certain approvals by the United States Department of Air Force.
One of the prerequisites by the Air Force for approval of locating the major aircraft industries at Los Angeles County Palmdale Airport, for the testing of jet aircraft, is that all property within a mile of the exterior boundaries of the Airport must be zoned A-2-5.
A survey made under supervision of the USAF and Confidential Eeport thereon indicate that jet aircraft equipped with afterburners will create a noise level detrimental to the welfare of densely built-up residential development within a mile of the exterior boundaries of the Airport.
A survey made by the Eegional Planning Commission shows that better than 90 percent of all the property within a mile of the exterior boundaries of the Palmdale Airport is now in parcels of land larger than five acres in area.
Therefore, to preclude the possibility of land developers taking advantage of the anticipated industrial development at the Palmdale Airport and thereby subdividing these properties into parcels of land less than five acres in area to the detriment of the community, it is recommended that your honorable body pass an urgency ORDINANCE zoning all properties within a mile of the exterior boundaries of the Los Angeles County Palmdale Airport in A-2-5 Zone. Said ordinance is to remain effective until the Eegional Planning Commission has an opportunity to make detailed studies, pursuant to Chapter 807, Statutes of 1947 of the State Conservation and Planning Act.
It is further recommended that your honorable body authorize and instruct the County Counsel to prepare this urgency ordinance and submit it to the Board of *324 Supervisors for adoption at its regular meeting Tuesday, August 7, 1951. _ ■
_ This matter was discussed with the Regional Planning Commission at its regular meeting Wednesday, July 25, 1951, and the Commission concurs in this request for the TJEGENCY ORDINANCE.
(b)A Los Angeles County zone classification of A-2-5 (referred to in the second paragraph of the letter quoted in paragraph (a) of this finding) permitted land to be used for heavy agricultural use, and required a minimum lot area of 5 acres.
6. (a) Pursuant to the recommendation made by the County Director of Aviation (see finding 5), the Board of Supervisors of Los Angeles County on July SI, 1951, adopted Ordinance No. 5781, establishing the Palmdale Airport District and placing restrictions on the size and use of lots within the district.
(b) Section 7 of Ordinance No. 5781 provided in part as follows:
Section 7. Each lot in any subdivision in the Palm-dale Airport District shall have an area of not less than five acres. * * *
(c) Section 8 of Ordinance No. 5781 stated as follow's;
Section 8. This ordinance is in contemplation of the preparation of a precise plan of a Master Plan of Land Use, which precise plan is to be adopted in conformity with the provisions of the Conservation and Planning Act. The Regional Planning Commission has now recommended, after holding the required public hearings, the same permanent zoning to the Board of Supervisors.
The district described in Section 1 of this ordinance adjoins the Palmdale Airport, is sparsely settled, and developed mainly to scattered residential and agricultural use. The activation of the Palmdale Airport will result in numerous planes flying over the territory described in Section 1 of this ordinance, and making it unfit for intensive residential development, or commercial or manufacturing use. This ordinance is, therefore, urgently required for the immediate preservation of the public peace, health and safety, and shall take effect upon the passage hereof.
(d) Many of the parcels that are involved in the present *325 cases were included within the Palmdale Airport District, as established by Ordinance No. 5781.
7. The restrictions referred to in finding 6 were superseded effective February 22, 1952, as a result of the adoption by the County Supervisors of Ordinance No. 5889, which repealed Ordinance No. 5781 and promulgated an official zoning plan for an area designated as the North Palmdale District. This district covered a geographical area larger than the Palmdale Airport District, as previously established by Ordinance No. 5781. All the parcels that are involved in the present cases were included within the boundaries of the North Palmdale District, and such parcels were zoned either as A-2-2 (heavy agriculture, with a minimum lot area of 2 acres) or A-2-5 (heavy agriculture, with a minimum lot area of 5 acres).
8. Following negotiations between the County of Los An-geles and the defendant relative to the acquisition of the Palmdale Airport by the defendant for the use of the Department of the Air Force, the Board of Supervisors of Los Angeles County on February 26, 1952, in anticipation of the ownership of the airport being subsequently transferred to the defendant, conferred upon the defendant a right of entry to utilize the facilities of the Palmdale Airport. From February 26, 1952, until May 1, 1953, the Palm-dale Airport was operated jointly, by the County of Los Angeles and the defendant. Since May 1, 1953, the airport -has been operated by the defendant. Title to the property was formally transferred to the defendant by means of a deed which was executed on February 2,1954, by the County of Los Angeles. This deed conveyed to the defendant 4,-552.07 acres of land for a consideration of $1,285,000. Additional acreage was acquired by the defendant after February 2, 1954, and added to the airport. The name of the facility was changed by the defendant'to Air Force Plant No. 42. (The phrase “Air Force Plant No. 42” will be used in subsequent findings to describe this airport, irrespective of whether a particular reference relates to a period before or after the defendant acquired the ownership of the property.)
*326 9. The defendant, in August 1954 extended the northeast-southwest runway at Air Force Plant No. 42 to a total length of 12,000 feet by adding 5,000 feet of runway onto the northeast end of the original northeast-southwest runway. In October 1956, the defendant constructed a new east-west runway 12,000 feet in length.
10. The prevailing wind in the region that includes Air Force Plant No. 42 is from the southwest.
11. Parcels 8, 10, 11, 12, 13, 16, 25, 27, 28, 31, 34, and 36 in the Aaron case are located in the approach zone to the southwest end of the northeast-southwest runway at Air Force Plant No. 42.[8] Parcels 11 and 27, which are closer to the end of the runway than any other parcels in the group, are approximately 8,000 feet from the southwest end of the northeast-southwest runway. Parcel 27 is in direct line with the runway. Parcel 31 is the most distant from the end of the runway, being about 11,000 feet from the end of the runway.
12. Parcels 21, 22, and 38 in the Aaron case are located outside but near the approach zone to the southwest end of the northeast-southwest runway at Air Force Plant No. 42. The distances of these parcels from the southwest end of the runway vary from approximately 9,000 feet to approximately 11,000 feet.
.13. Parcel 13 in the Andersen case is located outside but near the approach zone to the southwest end of the northeast-southwest runway at Air Force Plant No. 42. It is approximately 10,000 feet from the southwest end of the runway.
14. Parcel 4 in the Aaron case is located in the approach zone to the northeast end of the northeast-southwest runway at Air Force Plant No. 42. Its location was more than 17,000 feet from the end of the runway during the period February 1952-August 1954; and this parcel is more than 12,000 feet from the northeast end of the runway as extended in August 1954.
15. Parcels 1, 2, 3, 6, 7, 15, 17, 18, 19, 20, 23, 24, 26, 29, 30, 35, and 37 in the Aaron case are located in the approach zone to the west end of the new east-west runway at Air Force Plant No. 42. Parcels 15, 17, and 19, which are closer to the *327 end of the runway than any of the other parcels in the group, are approximately 11,000 feet from the west end of the new east-west runway. •
16. Parcels 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 14, 15, and 16 in the Andersen case are located in the approach zone to the west end of the new east-west runway at Air Force Plant No. 42.[9] Parcel 9, which is closer to the end of the runway than any of the other parcels in the group, is approximately 10,000 feet from the west end of the' new east-west runway.
17. Parcels 5, 9, 14, and 33 in the Aaron case are located wholly or partially in the approach zone to the east end of the new east-west runway at Air Force Plant No. 42. Only parcel 33 is located in direct line with the runway. It is approximately 10,000 feet from the east end of the new east-west runway.
18. Parcel 32 in the Aaron .case lies south of the approach zone to the northeast end of the northeast-southwest runway and north of the approach zone, to the east end of the new east-west runway at Air Force Plant No. 42. It is approximately 6,000 feet from the northeast end of the northeast-southwest runway, as extended in 1954, and approximately 10,500 feet from the east end of the new east-west runway.
19. Aircraft companies engaged in the production of jet aircraft for the .United States Air Force under contracts with the latter agency have established and maintained manufacturing plants at Air Force Plant No. 42 under agreements with the defendant. Under the terms of the contracts covering the manufacture of jet aircraft by such companies for the Air Force, legal title to the aircraft was •vested in the defendant during the process of manufacture and thereafter.
20. Beginning in February 1952 and continuing to the present time, the aircraft companies mentioned in finding 19 have flight-tested the jet aircraft prior to the acceptance of the aircraft by the Air Force. Such flight-tests have been made by flying the aircraft from and to Air Force Plant No. 42. During the period February-December 1952, an average of approximately 61 flight-tests per month were *328 made at Air Force Plant No. 42 by jet aircraft operated by company personnel. During that period, the original northeast-southwest runway was customarily used for the takeoffs and landings in connection with the flight-testing of jet. aircraft by company personnel. Approximately 85 percent of the takeoffs during the.period were made toward the southwest, and approximately 15 percent of the takeoffs were-made toward the northeast. Approximately 85 percent of the landings during the period February-December 1952; were made from the northeast, and approximately 15 percent of the landings were made from the southwest.
21. Beginning as early as August 1953, at least, and continuing until the present time, jet aircraft produced by aircraft companies at Air Force Plant No. 42 for the Air Force have been flight-tested by Air Force personnel at Air Force Plant No. 42, prior to the acceptance of the aircraft, by the Air Force. Preacceptance flight-tests of such aircraft by- company personnel have continued throughout this period.
■ 22. (a) In 1953 and thereafter, the use of Air Force Plant No. 42 for the flight-testing of jet aircraft became more and more frequent. The following table shows the total number of flight-tests that were made by various types of jet aircraft, at Air Force Plant No. 42 during the period 1953-1958:

Type Number of flights

F-94C _■ 3,084
T-33_'_1__ 8, 860
F-86D_ 628
F-86H_ 3,096
F-86F _ 695
F-86E _ 380
B-45A_ 53
F-100A _ 2,447
TF-86 _-_ 50
YF-100A_293
F-86K_ 32
F-100C _ 1,620
YF-86K_ 137
F-89_ 5,625
FJ-4_ ' 60
F-100F _ 626
F-107A _ 96
T-2J __ 8

Type Number of flights-

T-39- — _ 51
A-3J1_ 17
F-101A_ 11
F-106__■ 382'
F-101_ 48
B-57_ 40’
B-57A_ 451
F-102 - 8, 672’
A-4D- 1,229-
F — 4D_ 63
T-2V1 - 1,339-
F-104 - 5,492-
TV-2 -:_ 186
F-100D_ 1,750-
B — 450 _ 11
TF-100C_j_ 168-
Total-47, 718-
(b) The number of flight-tests of jet aircraft per month-that were made at Air Force Plant No. 42 during the period' 1953-1958 varied in 1953 from a low of 132 (January) to- *329 a high of 352 (December), in 1954 from a low of 296 (March) to a high of 675 (September), in 1955 from a low of 523 (November) to a high of 721 (June), in 1956 from a low of 489 (April) to a high of 1,001 (November), in 1957 from a low of 890 (February) to a high of 1,161 (August), and in 1958 from a low of 732 (December) to a high of 1,149 (October).
. (c) The evidence does not show which of the jet aircraft referred to in paragraphs (a) and (b) of this finding were operated by Air Force personnel and which were operated by company personnel during the flight-tests.
23. During the period since August 1953, at least, many ■flights by military jet aircraft, which already constituted equipment of the defendant and which were operated by personnel of the defendant, have been made to and from Air Force Plant No. 42. These flights have been in addition to the preacceptance test flights of jet aircraft referred to in previous findings.
24. Until October 1956, the northeast-southwest runway at Air Force Plant No. 42 was customarily used by jet aircraft for takeoffs from and landings at Air Force Plant No. 42, irrespective of whether such jet aircraft were operated by company personnel or Air Force personnel, and irrespective of whether such jet aircraft were being flight-tested prior to acceptance by the Air Force or already constituted military equipment of the defendant. During that period, approximately 85 percent of the takeoffs were toward the southwest, and approximately 85 percent of the landings were from the northeast.
25. (a) Since the construction of the new east-west, runway at Air Force Plant No. 42 was completed in October 1956, approximately 85 percent of the takeoffs by jet aircraft from Air Force Plant No. 42 have been made from the new east-west runway toward the west, and approximately 15 percent of the takeoffs have been made from the northeast-southwest runway toward the northeast.
(b) Since the construction of the new east-west runway at Air Force Plant No. 42 was completed, approximately 85 percent of the landings by jet aircraft at Air Force Plant No. 42 have been made from the northeast onto the northeast- *330 southwest runway, and approximately 15 percent of the landings have been made from the- west onto the new east-west runway.
(c) The statements contained in paragraphs (a) and (b) of this finding are applicable irrespective of whether the takeoffs and landings were'made, by jet aircraft that were being flight-tested prior to acceptance by the Air Force or by jet aircraft that already constituted military equipment of the defendant, and irrespective of whether the jet aircraft were being operated by personnel of the defendant or by company personnel.
■ 26. At all times material to these cases,- takeoffs from and landings at Air Force Plant No. 42 have been subject to flight regulations promulgated by the Air Force and its local representative at Air Force Plant No. 42. These regulations have at all times required aircraft to fly at altitudes higher than 500 feet above the ground, except during the initial stage of the takeoff procedure and the final stage of the landing procedure. Concern for the enforcement of this requirement was consistently manifested by the responsible Air Force officers.
27. (a) In the takeoff procedure prescribed under the regulations referred to in finding '26, a jet aircraft starts its takeoff roll from the downwind end of a runway, and utilizes anywhere from approximately 3,200 feet to approximately 5,000 feet of the runway for the takeoff roll, before becoming airborne. The amount of runway used depends primarily upon the type of aircraft, but also upon the extent of the load carried by the plane and upon weather conditions.
' (b) A jet aircraft taking off from a runway at Air Force Plant No. 42 is required by the flight regulations to gain altitude as rapidly as possible and, upon reaching an altitude of approximately 500 feet above the ground, to make a turn. The prescribed turn at the '500-foot level is made to the right on takeoffs fi’om the northeast-southwest runway toward the southwest, and on takeoffs from the new east-west runway toward the west. It is made to the left on takeoffs from the northeast-southwest runway toward the northeast, and on takeoffs from the new east-west runway toward the east. The direction of the prescribed turn has *331 been fixed in order to avoid, if possible, passing over settled areas in the vicinity of Air Force Plant No. 42 during the takeoff procedure.
(c) From time to time, jet aircraft flying special missions from Air Force Plant No. 42 have been permitted, after reaching an elevation of approximately 500 feet above the ground on takeoff, to proceed straight ahead or to make a turn different from the one prescribed in the flight regulations.
• 28. Most landings by jet aircraft onto the northeast-southwest runway at Air Force Plant No. 42 from the northeast are controlled by an instrument landing system (ILS), which has been in operation since 1953. This aid to landing is accomplished by the transmission of an electronic beam, which is projected to the northeast along the center line of the northeast-southwest runway, and extends outward into space approximately 20 miles at an upward angle of 2% degrees. The beam is intercepted by incoming aircraft when they are approximately 1,500 feet above the ground, and it is generally picked up by the aircraft about 5.3 nautical miles from the northeast end of the runway. The aircraft then follows the ILS signal to the point of touchdown, which is near the northeast end of the runway. Parcel 4 in the Aaron case is the only parcel that is situated in the approach zone to the northeast end of the northeast-southwest runway, and it is the only parcel that would be passed over by an aircraft making an ILS approach for a landing. There is no evidence in the record indicating that jet aircraft making ILS approaches for landings have passed over parcel 4 in the Aaron case at an altitude less than 500 feet from the ground, or that such flights have substantially interfered with the use and enjoyment of this parcel.
29. Under the flight regulations governing landings by jet aircraft at Air Force Plant No. 42 (other than ILS landings onto the northeast-southwest runway, as to which see finding 28), the prescribed landing pattern begins at a point some 3 to 5 miles downwind from the end of the runway that is to be used. At that point, the aircraft is required to be approximately 1,500 feet above the ground, and it is ordinarily flying at a speed of about 300 knots per *332 hour. The plane proceeds in line with the runway toward the end of the runway, maintaining an altitude of about 1,500 feet above the ground. When the aircraft reaches a point above the downwind end of the runway, power is reduced and the plane is put into a left turn in order to fly an elliptical course that will ultimately bring it back in line with the runway for a landing near the downwind end •of the runway. The plane maintains its elevation of about 1,500 feet above the ground while it is flying away from the runway during the first stage of the elliptical course, and also while it is flying a downwind leg more or less parallel to the runway during the second stage of the elliptical course. The altitude of the plane is gradually reduced during the later stages of the elliptical course, so that the plane is at an elevation of approximately 500 feet above the ground when it makes the final turn in order to line up with the runway for a landing. When the process of lining up with the runway is completed, the plane is flying at an altitude of about 300 feet above the ground. The plane then proceeds to the point of touchdown, which is a short distance heyond the end of the runway.
30. Flights by Air Force B-52 bombers engaged in practicing touch-and-go landings and takeoffs at Air Force Plant No. 42 have been outside the flight patterns mentioned in findings 27-29. The B-52 bombers have made fairly frequent use of Air Force Plant No. 42 for touch-and-go landings and takeoffs since the early part of 1957. They have generally used the east-west runway for that purpose, landing from the east and immediately taking off toward the west after touching down briefly on the runway, then, after attaining an altitude of at least 500 feet above the ground, turning and flying an elliptical course — most frequently to the right, but sometimes to the left — in order to get in position for another touch-and-go landing and takeoff. Upon completing a series of touch-and-go landings and takeoffs, a B-52 bomber would depart from Air Force Plant No. 42 to its home base or some other airport. During the maneuvers described in this finding, B-52 bombers have flown many times over parcels located in the western and eastern areas (see findings 15-18) , but they have not made *333 frequent flights over any of the parcels at an altitude of less than 500 feet above the ground. However, even at an altitude somewhat higher than 500 feet above the ground, the noise made by the engines of a B-52 bomber is disturbing to persons on the ground, as such noise interferes with conversation, either on the telephone or person-to-person, and it interferes with television and radio reception. In addition, the passage of a B-52 bomber through the air at an altitude somewhat higher than 500 feet above the ground causes vibrations that affect buildings on the ground and their contents.
31. (a) During the period from February 1952 until October 1956, jet aircraft which had been manufactured by aircraft companies for the Air Force under contracts with the defendant but not yet accepted by the Air Force, and which were being subjected to preacceptance flight-tests by company personnel at Air Force Plant No. 42, regularly and frequently flew over parcels 10,11, 12, 13, 16, 25, 27, 28, and 34 in the Aaron case at an altitude of 400 feet above the ground.
(b) During the period from August 1,1953, until October 1956, jet aircraft operated by Government personnel at Air Force Plant No. 42 regularly and frequently flew over parcels 10, 11, 12, 13, 16, 25, 27, 28, and 34 in the Aaron case at an altitude of 400 feet above the ground. Many of these were aircraft which had been manufactured by aircraft companies for the Air Force under contracts with the defendant but not yet accepted by the Air Force, and which were being subjected to flight-tests by Government personnel prior to their acceptance by the Air Force. The remainder of the aircraft referred to in this paragraph were already military equipment of the United States.
(c) The vibrations from the flights referred to in paragraphs (a) and (b) of this finding shook buildings located on the parcels, and the noise from such flights interfered with radio and television reception, made it impossible to use the telephone or to conduct a conversation person-to-person, made some of the occupants nervous, and, in some instances, caused chickens to “pile up” in chicken houses on the parcels.
(d) The flights by jet aircraft referred to in paragraphs *334 (a), (b), and (c) of tbis finding constituted direct, immediate, and substantial interferences with the respective owners’ use and enjoyment of the several parcels.
(e) When the jet aircraft referred to in paragraphs (a) and (b) of this finding began to make frequent and low flights over parcels 10, 11, 12, 13, 16, 25, 27, 28, and 34 in the Aaron case, it was the intention of the defendant that such flights should continue for the indefinite future. How-over, because of changes that were subsequently made in the runways at Air Force Plant No. 42, Government personnel ceased to make frequent flight over these parcels at altitudes of less than 500 feet above the ground in about October 1956.
32. Except for the parcels mentioned in finding 31, jet aircraft did not, since February 1952, make frequent flights at altitudes of less than 500 feet above the ground over any of the parcels involved in the Aaron and Andersen cases.
33. Since March 23, 1953, the plaintiffs Jack W. Clip-pinger and Irene Clippinger, husband and wife, have been the owners, under a duly executed deed, of parcel 10 in the Aaron case, which is described as follows: Parcel 27, Unit 2, being a portion of Eecords of Survey Subdivision filed in Hook 65 at Page 19 of Eecords of Survey, Eecords of Los Angeles County, California, excepting therefrom the southerly 180 feet of the westerly 130 feet thereof, and being further described as the 8% of the SE24 of the SE14 of the SE%, Sec. 14, T. 6 N., E. 12 W., S.B.B. & M., situated in Los Angeles County, California, and being 4.7 acres, more or less.
34. (a) The plaintiffs Joseph B. Coburn and Sarah L. Cobum, husband and wife, are the owners of parcel 11 in the Aaron case, which is described as follows: Parcel 20, Unit 2, being a portion of Eecords of Survey Subdivision filed in Book 65 at Page 19 of Eecords of Survey, Eecords of Los Angeles County, California, and being further described as the S^4 of the NE14 of the SE14 of the SEj4, Sec. 14, T. 6 N., E. 12 W., S.B.B. & M., situated in Los Angeles County, California, and being 5 acres, more or less.
(b) The plaintiffs Joseph B. and Sarah L. Cobum entered into a contract with the preceding owner on May 7, 1952, for the purchase of parcel 11 in the Aaron case at a fixed price. They spent from 1 to 3 days per week on the parcel *335 during the period from May 1952 until the early part of 1954, when they took up their permanent residence on the property. The deed formally conveying the legal title to Joseph B. and Sarah L. Coburn was executed by the preceding owner on May 8, 1958.
35. Since November 27, 1946, the plaintiffs Sidney S. Cogbum and Bertha M. Cogbum, husband and wife, have been the owners, under a duly executed deed, of parcel 12 in the Aaron case, which is described as follows: Lot 46 in Tract 7670, as per map recorded in Book 114 at Pages 28-80 of Maps, Records of Los Angeles County, California, situated in said comity and State, and being 10 acres, more or less.
36. Since February 14, 1953, the plaintiffs Clifford E. Dahl and Wanda L. Dahl, husband and wife, have been the owners, under a duly executed deed, of parcel 13 in the Aaron case, which is described as follows: the S% of the NV2 of Lot 66 in Tract 5110, as per map recorded in Book 117, Pages 28-29 of Maps, Records of Los Angeles County, California, situated in said county and. State, and being 2.28 acres, more or less;
37. Since March 26, 1949, the plaintiffs Ralph L. Fogg and Helen M. Fogg, husband and wife, have been the owners, under a duly executed deed, of parcel 16 in the Aaron case, which is described as follows: the southerly 330 feet of Lot 63, Tract 7670,.as per map recorded in Book 114 at Pages 28-30 of Maps, Records of .Los Angeles County, California, situated in said county and State, and being 5 acres, more or less.
38. Since July 1, 1952,.the plaintiffs Albert L. McGuire and Carmella R. McGuire, husband and wife, have been the owners, under a duly executed deed, of parcel 25 in the Aaron case, which is described as,follows: all of Parcel 18, Unit 2, being a portion of Records of Survey Subdivision, filed in. Book 65 at Page 19,. Records of Survey, Records of Los Angeles County, California, and more particularly described as the NINA of the ,SW!4 of the SE14, Sec. 14, T. 6 N., R. 12 W., S.B.B. & M., situated in Los Angeles Comity, California, and being 5.02 acres, more or less.
■ 39.- (a) The plaintiffs'Raymond W. Morrett and Betty N. Morrett, husband and wife,'are the owners of parcel 27 in the *336 Aaron case, which is described as follows: all of Parcel 24, being a portion of Records of Survey Subdivision filed in Book 65 at Page 19, Records of Survey, Records of Los Angeles County, California, situated in Los Angeles County, California, and being 5% acres, more or less.
' (b) The plaintiffs Raymond W. and Betty N. Morrett were in possession of parcel 27 in the Aaron case on August 1, 1953, under a written contract for the purchase of this property at a fixed price. The contract had been entered into by Mr. and Mrs. Morrett on October 10, 1952, with the preceding owners of parcel 27; and the Morretts had taken possession of the property shortly thereafter. Mr. and Mrs. Morrett lived in a trailer at first, and then built a house. The deed formally conveying the legal title to Mr. and Mrs. Morrett was executed by the preceding owners on August 23, 1957.
40, (a) Since February 7, 1946, the plaintiff Minnie H. Morris, a married woman, has owned as her separate property, under a duly executed deed, parcel 28 in the Aaron case, which is described as follows: Lot 63 in Tract 7670, as per map recorded in Book 114 at Pages 28-30 of Maps, Records of Los Angeles County, California, except the south 330' feet thereof, and also except the north 138.2 feet and the east 10 feet of the remainder, situated in Los Angeles County, California, and being 3 acres, more or less.
(b) The plaintiff Minnie H. Morris was on August 1,, 1953, and she is now, the wife of the plaintiff John F. Morris, Jr.
41. Since April 15, 1947, the plaintiffs Clayton E. Smith and Delia A. Smith, husband and wife, have been the owners, under a duly executed deed, of parcel 34 in the Aaron case, which is described as follows: the south 332.77 feet of Lot 67 in Tract 5110, as per map recorded in Book 117, Pages 28-29 of Maps, Records of Los Angeles County, California, situated in said county and State, and being 5 acres, more or less.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs in the case of Andersen, et al. v. *337 United States, No. 113-59, are nob entitled to recover and their petition is dismissed as to all plaintiffs. It is further concluded that the plaintiffs Jack W. Clippinger and Irene Clippinger (9), Joseph B. Coburn and Sarah L. Cobum (10), Sidney S. Cogburn and Bertha M. Cogburn (11), Clifford E. Dahl and Wanda L. Dahl (12), Ralph L. Fogg and Helen M. Fogg (15), Albert L. McGuire and Carmella R. McGuire (24), Raymond W. Morrett and Betty N. Morrett (26), John F. Morris, Jr., and Minnie Morris (27), and Clayton E. Smith and Delia A. Smith (33), in the case of Aaron, et al. v. United States, No. 489-58, are entitled to recover. Judgment will be entered to that effect, and the case is remanded to the Trial Commissioner in accordance with this opinion, to determine the amount of just compensation to which each of the above plaintiffs is entitled. The remainder of the plaintiffs in the A aron case are not entitled to recover and that portion of the petition relating to them is , dismissed.

 The Andersen case originally Involved an additional parcel, numbered 10, •allegedly owned by Leroy ,T. Miller and his wife, Bernalda I. Miller. However, the claim of the Millers was withdrawn during the trial.

 The evidence does not show clearly which of the jet aircraft referred to in this statistical information were operated by Air Force personnel and which were operated by company personnel during the flight-tests. Company personnel presumably operated the aircraft that were flight-tested during the early period from February 1952 to about August 1953; and it is inferred that the statistics for the period thereafter cover both flight-tests conducted by eomr pany personnel and flight-tests conducted by Government personnel.

 The amount of runway used depends primarily upon the type of aircraft,, but also upon the extent of the load carried by the plane and upon weather-conditions.

 If a plane were flying a special mission, it might be granted permission,, as an exception, to proceed on toward the southwest after reaching an altitude of 500 feet.

 This is an inference drawn from (among other things) defendant’s exhibit 52. This exhibit shows the prescribed flight patterns at Air Force Plant No. 42 after the northeast-southwest runway had been extended to a total length of 12,000 feet in August 1954 by adding 5,000 feet of runway onto the northeast end of the original runway. The prescribed flight pattern governing takeoffs from the northeast-southwest runway toward the southwest after August 1954 called for planes to reach the 500-foot altitude and to make a right-hand turn at a point less than a mile northeast of parcel 27. Therefore,. *307 during the earlier period when the takeoff roll began at a point 5,000 feet nearer parcel 27, the plane would be over or beyond parcel 27 when it reached an altitude of 500 feet above the ground and made the prescribed right-hand turn.

 Fractional portions of parcels 16 and 34 extend outside the approach zone.

 Parcel 10 in the Andersen case is also located in the same approach zone. However, that parcel was withdrawn from the litigation at the trial.

 Fractional portions of parcels 16 and 34 extend outside the approach zone.

 Parcel 10 In the Aniersen case Is also located In the same approach zone. However, that parcel was withdrawn from the litigation at the trial.