136 P.3d 310

**The CITY OF COEUR D'ALENE, an Idaho Municipal Corporation, Plaintiff–Counterdefendant–Respondent,**

v.

**Jack W. SIMPSON and Virginia S. Simpson; and Beach Brothers, Inc., an Idaho corporation, Defendants–Counterplaintiffs–Appellants.**

No. 29299.

Supreme Court of Idaho, Coeur d'Alene, October 2005 Term.

April 27, 2006.

John F. Magnuson, Coeur d'Alene; Runft Law Offices, PLLC, Boise, Idaho, for appellants. John F. Magnuson argued.

Quane, Smith, Coeur d'Alene, for respondents. Michael L. Haman argued.

## SUBSTITUTION OPINION.

**THE COURT'S PRIOR OPINION DATED FEBRUARY 8, 2005, IS HEREBY WITHDRAWN.**

JONES, Justice.

The Fifth Amendment to the United States Constitution, made applicable to the states via the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." Appellant Beach Brothers, Inc. alleges just such a thing happened to its lakefront property on Lake Coeur d'Alene. The district court disagreed and dismissed Beach Brothers' claims on summary judgment. We reverse and vacate certain of the rulings and remand for further proceedings.

### I.

In 1994 Jack and Virginia Simpson purchased two parcels of property from one Donald Wagstaff. The two parcels are separated physically by Lakeshore Drive, which runs roughly east-west, just north of Lake Coeur d'Alene. The parcel north of Lakeshore Drive, referred to as the upland parcel, includes four lots in the Lakeshore Addition to the City. The parcel south of Lakeshore Drive, referred to as the waterward parcel, consists of three tax lots on Sanders Beach. It does not appear these tax lots were part of the Lakeshore Addition. Both parcels share a single street address and, since at least 1928 and until 2001, the parcels were always conveyed together.

By 1997, the Simpsons were apparently fed up with people entering and mistreating the waterward parcel so they installed two sections of chain-link fence near the western and eastern boundaries of the parcel. Upon learning this, the City issued the Simpsons a stop-work order, citing city ordinances that prohibited construction of fences and other structures within 40 feet of the shoreline. These ordinances, called the "Shoreline Regulations," regulate construction and placement of objects on the area south of Lakeshore Drive. The first of these ordinances, No. 676, was enacted in 1928 and prohibited construction of any structure on the property south of Lakeshore Drive. Ordinance No. 1197, passed in 1965, amended Ordinance No. 676 and prohibited structures on Sanders Beach. Then, in 1982, the City passed Ordinance No. 1722, which prohibited all construction within 40 feet of the shoreline of

Lake Coeur d'Alene (with certain exceptions that do not apply here).[1]

■ In 1998, after the Simpsons declined to remove the fences, the City sought a permanent injunction requiring the Simpsons to remove them.[2] The Simpsons answered and counterclaimed. In their answer they contended the Shoreline Regulations violated their rights to due process and equal protection under the State and Federal Constitutions since the ordinances were being applied to them unequally and deprived them of all economically viable use of their property without paying just compensation. The Simpsons also asserted a counterclaim under 42 U.S.C. § 1983 for inverse condemnation. Late in 1999, the City sought summary judgment on both its claims and the counterclaims. In August 2000 the district court issued a memorandum decision on the motion, concluding that the 40-foot setback requirement did not constitute a taking, but that a question of fact remained on whether the ordinances deprived the property of all economically viable use. In that memorandum decision the court also dismissed the Simpsons' equal protection claim.

That, however, did not end the litigation. In 2001, Jack Simpson formed Beach Brothers as an Idaho corporation and named the Simpsons' adult sons as sole shareholders. Jack and Virginia then quitclaimed the waterward parcel to Beach Brothers.[3] The City amended its complaint, adding Beach Brothers as a defendant. The Simpsons and

Beach Brothers filed an amended answer and counterclaim. The City again moved for summary judgment. In October 2002 the district court issued a memorandum decision wherein it found the City was entitled to injunctive relief as to the fences that were within the 40-foot area where structures were not allowed. No taking had occurred because, the court wrote, when considering both parcels together, they retained value. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Additionally, the court ruled no taking had occurred under *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), because the ordinances served the legitimate public purpose of preserving the shoreline's aesthetic features. And while the court found it unclear whether Beach Brothers was asserting a taking by physical occupation, *see Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392, 62 L.Ed.2d 332, 345–46 (1979), it ruled there were no facts to support such a claim. The court also dismissed the Simpsons' and Beach Brothers' equal protection and due process counterclaims. An order requiring the removal of the fences issued two months later. This appeal followed.

## II.

■ After the City filed its first motion for summary judgment, the Simpsons moved to disqualify the district judge under Idaho R. Civ. P. 40(d)(2). They asserted (1) that the

---

1. In a 1997 district court decision, it was determined that Ordinance Nos. 676 and 1197 remained in effect after passage of Ordinance No. 1722 and codification of city ordinances. After examining the pertinent enactments and codifications from 1928 through 1996, the district court rejected the City's claim that the codified shoreline regulations superseded Ordinance Nos. 676 and 1197. *Sanders Beach Preservation Association, et al. v. City of Coeur d'Alene,* Kootenai County district court case no. CV–97–05743, Memorandum Opinion and Order In Re: Writ of Mandate, entered on October 21, 1997, the Honorable Gary M. Haman, district judge, presiding. The district court determined (1) that the ordinances were not of a "general" nature and thus were not subject to codification, (2) that the ordinances had not been expressly or impliedly repealed, and (3) that the ordinances remained in effect because they were not in conflict with the codified shoreline regulations, but that if

there was a conflict the more restrictive ordinances applied. Judge Haman ruled that the prohibition against construction on the waterward side of Lakeshore Drive must be enforced.

2. The southern boundary of the waterward parcel is not necessarily the lake. It is, in fact, the ordinary high water mark. *See Idaho Forest Indus., Inc. v. Hayden Lake Watershed Imp. Dist.,* 112 Idaho 512, 516, 733 P.2d 733, 737 (1987). The State owns the property below that mark. *Id.* The precise location of the ordinary high water mark on Lake Coeur d'Alene has been the subject of longstanding controversy and is currently in litigation.

3. The Simpsons asserted this was done for estate planning purposes and to protect them from potential liability associated with personal ownership of that parcel.

judge was disqualified by virtue of his prior representation of the City of Coeur d'Alene while in private practice, and (2) that the judge had on his property a fence which violated City ordinances regarding visual obstructions near intersections, creating an appearance of impropriety. Rule 40 provides that any party to an action may disqualify a judge when the judge has an interest in the case, Idaho R. Civ. P. 40(d)(2)(A)1, or when the judge "has been attorney or counsel for any party in the action or proceeding," Idaho R. Civ. P. 40(d)(2)(A)3. The Idaho Code of Judicial Conduct requires a judge to disqualify himself in a case where he served as a lawyer in the matter in controversy. Idaho Code Jud. Conduct, Canon 3E(1)(b). In a written decision, the district court denied the motion "[b]ased upon the reasons set forth in the record of proceedings held January 4, 2000 . . . ." Orders on motions to disqualify are evaluated according to abuse-of-discretion rules. *Samuel v. Hepworth, Nungester & Lezamiz, Inc.*, 134 Idaho 84, 88, 996 P.2d 303, 307 (2000).

■ For a number of reasons, we affirm the district court's ruling. First, the "reasons set forth in the record of proceedings held January 4, 2000" are unknown. The transcript of said proceedings would doubtless let us in on the reasons for the judge's ruling. Alas, they are not in the record and Beach Brothers did not request a transcript of those proceedings in its notice of appeal. The appellant, of course, bears responsibility to furnish the Court with a record sufficient to substantiate the claim. *Belk v. Martin*, 136 Idaho 652, 660, 39 P.3d 592, 600 (2001). Without the transcript, we will not presume error, *State v. Murphy*, 133 Idaho 489, 491, 988 P.2d 715, 717 (Ct.App.1999), and we are unable to evaluate the claim.

■ Second, even assuming Beach Brothers' claims are true, we see nothing inherently flawed in the judge's decision. It appears from the record that in his former life as a practicing attorney the judge did

represent the City in a proceeding regarding the validity and enforcement of the Shoreline Regulations. (The company does not contend that the judge represented the City in *this* proceeding.) Eager to point out that it is not questioning the judge's integrity, Beach Brothers argues that this causes an appearance of impropriety and must be avoided. The problem with Beach Brothers' argument is that its logical and necessary application equates to a rule that would force many members of the judiciary out of cases where their former employers were parties, regardless of whether the judge was a lawyer in the particular proceeding. For example, under Beach Brothers' theory, a judge who had served as county prosecutor would be disqualified from presiding over any case in which the county was a party, simply by virtue of his prior employment. A former state attorney general, serving on this Court, would be disqualified from any appeal involving the State. A per-se rule with this result is unnecessary and patently unworkable. Rule 40(d)(2)(A)3 must be read together with Canon 3 E(1)(b) of the Code of Judicial Conduct, requiring disqualification only where the judge has served the former client in the matter in controversy. Accordingly, the fact that the judge once represented the City [4]— even regarding the validity and enforcement of the ordinances at issue in this case—is not, by itself, a viable ground on which to base a motion to disqualify.

Third, the judge's name is stamped prominently on the front page of the complaint. Presumably, counsel knew of the identity of the judge upon filing the action and was aware of the fact that the judge had formerly represented the City. That would have been the opportune time to have filed a disqualification under Rule 40(d)(1), if this was a matter of such great concern. It is unknown why that avenue was not pursued.

■ And finally, Beach Brothers' argument that the district judge's allegedly non-conforming fence creates an appearance of

4. Judge Hosack, then a practicing attorney, had represented the City in the litigation referenced in footnote 1, wherein he unsuccessfully contended that the codified shoreline regulations superseded Ordinance Nos. 676 and 1197. This argument was rebuffed by the district court. Having at that time not been an advocate for the building restrictions in the Shoreline Regulations, it is difficult to see how he might be biased against the Simpsons.

impropriety is a bit far afield. Beach Brothers failed to offer a plausible argument as to how the fence gives the district judge an interest in the case, and it is equally bewildering how the judge's fence would possibly call into question his ability to fairly and impartially decide issues in the case. We see nothing about the judge's fence that, even if true, creates an appearance of impropriety.

### III.

▆▆ We deem it necessary to consider an issue not presented by the parties. Though neither party has argued the issue, ripeness is a prerequisite to justiciability and we cannot ignore it. *See United States v. Antelope,* 395 F.3d 1128, 1132 (9th Cir.2005). Generally speaking, where a zoning ordinance includes a procedure for obtaining a variance from the prescribed requirements, a regulatory takings claim is not ripe until the landowner has requested and been denied the variance. *Williamson Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 187–88, 105 S.Ct. 3108, 3116–17, 87 L.Ed.2d 126, 139–40 (1985). Ordinance No. 1722 provides that "[a] variance may be granted from any provision of the Shoreline Regulations, ... provided that the variance conforms to the stated purpose of the Shoreline Regulations." Beach Brothers does not appear to have ever sought a variance.

The stated purpose of the Shoreline Regulations is found in two places. First, Ordinance No. 676 provides that the public interest, peace, safety, morals, order, and welfare "require that no buildings or structures be erected or maintained south of Lakeshore Drive, east of Eleventh Street." The ordinance goes on to prohibit structures on the waterward side of Lakeshore Drive. In Ordinance No. 1722, the purpose is to "protect, preserve and enhance visual resources and public access of the Coeur d'Alene shoreline...." That ordinance prohibits construction within 40 feet of the shoreline, except for limited exceptions that are not pertinent here. These statements and prohibitions make it clear that any structure would be contrary to the purpose, as well as the restrictions, of the Shoreline Regulations and thus, it is equally clear that a variance would

not be available. We believe the *Williamson Planning* rule must be considered in context. In *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), the U.S. Supreme Court wrote that "once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." 533 U.S. at 620, 121 S.Ct. at 2459, 150 L.Ed.2d at 608–09. In that case, filling the land in question was prohibited under state law. *Id.* at 614, 121 S.Ct. at 2455–56, 150 L.Ed.2d at 605. A single exception was available if a "compelling public purpose" would be served by filling. *Id.* The permitting agency concluded the landowner's plan—to fill the land to build a beach club—did not satisfy the "compelling public purpose" standard and rejected the application. Writing for the Court, Justice Kennedy noted that the final-decision rule in *Williamson Planning* "responds to the high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer." *Id.* (Quoting *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 738, 117 S.Ct. 1659, 1667, 137 L.Ed.2d 980, 993 (1997).) Indeed, in *Williamson Planning,* it appeared that variances could have been granted to resolve much of the permitting authority's objections to the plan. *Williamson Planning,* 473 U.S. at 188, 105 S.Ct. at 3117, 87 L.Ed.2d at 139–40. *See also Mac-Donald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 352, 106 S.Ct. 2561, 2568, 91 L.Ed.2d 285, 296 (1986) (taking claim was not ripe where there was "le[ft] open the possibility that some development will be permitted"). By contrast, Palazzolo's case was "quite unlike those ... which arose when an owner challenged a land-use authority's denial of a substantial project, leaving doubt whether a more modest submission or an application for a variance would be accepted." *Id.* at 620, 121 S.Ct. at 2459, 150 L.Ed.2d at 608–09.

▆▆ We have before us a case similar to *Palazzolo.* Though Beach Brothers has not submitted an application, it seems that if, to get a variance, a proposed project must

"conform[ ] to the stated purpose of the Shoreline Regulations," and if the stated purpose is to prevent structures from going up on the beach, then a fence would not be permissible. The plain language of those ordinances grants no discretionary authority to City officials to allow a fence on Sanders Beach, particularly within 40 feet of the shoreline. It should be pointed out that a public body may not permit a use that is prohibited by an ordinance. *County of Ada, Board of County Com'rs v. Walter,* 96 Idaho 630, 632, 533 P.2d 1199, 1201 (1975) (county commissioners may not allow a use that would violate a zoning ordinance); *Hubbard v. Canyon County Com'rs,* 106 Idaho 436, 437, 680 P.2d 537, 538 (1984) (county commissioners may not permit an implied variance violative of land use ordinances); *City of Burley v. McCaslin Lumber Co.,* 107 Idaho 906, 909, 693 P.2d 1108, 1111 (Ct.App.1984) (a variance request contemplates no modification of the zoning ordinance). Indeed, a variance is only available in limited circumstances not present here. *See* Idaho Code § 67–6516. The reason a variance may not contravene a provision in a land use ordinance is that the pertinent governing body enacts a land use ordinance in its legislative capacity, but it considers a variance in a quasi-judicial capacity. *See Cooper v. Board of County Com'rs of Ada County,* 101 Idaho 407, 614 P.2d 947 (1980). Thus, a county commission or city council cannot amend a land use ordinance in a variance proceeding.

In this case neither the district court nor the parties have contended that a variance would be available under the Shoreline Regulations for the fence that the Simpsons constructed in 1997. All assumed the continued vitality of Ordinance Nos. 676 and 1197, as per the court decision referenced in footnote 1, and it appears to be fairly obvious that the fence is violative of both the purpose of, and prohibitions contained in, the Shoreline Regulations. Accordingly, we conclude there is a live controversy ripe for adjudication.

## IV.

### A.

■ We now consider Beach Brothers' regulatory takings claims. Before diving into the substantive issues, we deal initially with a procedural issue. The district court found that Beach Brothers' regulatory takings claims were time-barred. It noted that under Idaho law, an inverse condemnation claim is governed by the four-year statute of limitations found at I.C. § 5–224. The court then ruled that the claim accrued no later than the date of enactment of the Shoreline Regulations. This was incorrect. A claim for inverse condemnation "accrues after the full extent of the impairment of the plaintiffs' use and enjoyment of [the property] becomes apparent." *Tibbs v. City of Sandpoint,* 100 Idaho 667, 671, 603 P.2d 1001, 1005 (1979) (quoting *Aaron v. United States,* 160 Ct.Cl. 295, 311 F.2d 798, 802 (1963)). In *Palazzolo,* the United States Supreme Court held that a regulatory takings claim does not become ripe upon enactment of the regulation; indeed, it remains unripe until the landowner takes the reasonable and necessary steps to allow the regulating agency to consider development plans and issue a decision, thereby determining the extent to which the regulation actually burdens the property. 533 U.S. at 620–21, 121 S.Ct. at 2459–60, 150 L.Ed.2d at 608–09.. Beach Brothers contends that the full extent of its property loss would not have been apparent until, at the very earliest, October 21, 1997, when the district court issued the decision referenced in footnote 1. According to Beach Brothers, "Indeed, it was not until that date that the City, let alone [Beach Brothers], knew that Ordinance No. 676 had not been implicitly repealed by Ordinance No. 1722." More important, however, is the fact that the City brought this action in 1998 to require removal of the fences constructed by the Simpsons in 1997. The issue was joined at that time. Thus, Beach Brothers' regulatory takings claims did not accrue upon enactment of the Shoreline Regulations and the district court's ruling on this issue is reversed.

### B.

■ Now to the substance of the matter. While the Takings Clause was originally thought to contemplate only the physical seizure of property by the government, *Lucas,*

505 U.S. at 1014, 112 S.Ct. at 2893, 120 L.Ed.2d at 811–12, courts have long held that governmental conduct not involving the physical appropriation of property may so interfere with private interests in property as to constitute a taking. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 414–15, 43 S.Ct. 158, 159–60, 67 L.Ed. 322, 325–26 (1922). Allegations that a regulation has effected a regulatory taking are evaluated according to categorical or non-categorical rules, depending on the nature of the claimed taking. The United States Supreme Court has identified two types of regulatory action that constitute categorical or *per se* takings:

First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. See *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property. *Lucas,* 505 U.S., at 1019, 112 S.Ct. 2886 [at 2896, 120 L.Ed.2d at 815] (emphasis in original).

*Lingle v. Chevron U.S.A.,* 544 U.S. 528, 537–38, 125 S.Ct. 2074, 2081, 161 L.Ed.2d 876, 887 (2005). Here, Beach Brothers has not alleged or argued a *Loretto*-type taking.

Rather, Beach Brothers argues that the Shoreline Regulations have deprived it of "all economically productive or beneficial uses" of its waterward parcel.

 Beach Brothers contends, further, that even if the Shoreline Regulations did not effect a categorical taking, they have effected a non-categorical taking by virtue of diminishing the value of its property. Most regulatory takings claims are of the non-categorical type, which have been analyzed under rules set out by the United States Supreme Court in *Penn Central.* A non-categorical analysis is an "ad hoc, factual inquir[y]" that considers (1) the economic impact of the regulation; (2) the extent to which the regulation interferes with reasonable investment-backed expectations; and (3) the character of the governmental action. 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648.[5]

 In order to analyze either of the regulatory taking claims at issue here, one must determine the property at issue and the value thereof that has been taken. Or, as the Ninth Circuit stated the matter in *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 216 F.3d 764, 774 (9th Cir.2000):

"Because our test of regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to

5. It should be noted that in *Lingle v. Chevron USA,* the Supreme Court removed from the takings inquiry the "substantially advances" test, articulated in *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), and relied on by the district court in this case as part of its analysis under *Penn Central.* That test derived from due process, not takings, principles and thus "is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment." 544 U.S. at 542–44, 125 S.Ct. at 2084, 161 L.Ed.2d at 890. The regulatory takings tests, expressed in *Loretto* (regulation approving of physical invasion, however minute, is a taking), *Lucas* (regulation depriving owner of all economically viable use of land is taking), and *Penn Central* (economic impact/interference with investment-backed expectations/character of governmental action), "aim[] to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."

*Lingle,* 544 U.S. at 538–40, 125 S.Ct. at 2082, 161 L.Ed.2d at 888. By contrast, the "substantially advances" test "probes the regulation's underlying validity." *Id.* 542–44, 125 S.Ct. at 2084, 161 L.Ed.2d at 890. Whereas the takings clause allows property to be taken for public use in exchange for just compensation, "no amount of compensation" can authorize a regulation that is "so arbitrary as to violate due process." *Id.* Accordingly, *Agins*' "substantially advances" test "has no proper place in our takings jurisprudence." *Id.* at 547–48, 125 S.Ct. at 2087, 161 L.Ed.2d at 889. It was apparently the "character of the governmental action" prong of the *Penn Central* test which courts read to justify inquiry into the relative goodness of the action. In fact, in the context in which that phrase is found, "character of the governmental action" referred to whether the alleged taking was via regulation or a physical invasion. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. This is what the Court corrected in *Lingle.*

define the unit of property 'whose value is to furnish the denominator of the fraction' " *Keystone Bituminous Coal Ass'n [v. DeBenedictis]*, 408 U.S. at 497, 107 S.Ct. 1232 [at 1248, 94 L.Ed.2d at 496] (quoting Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of 'Just Compensation' Law*, 80 Harv. L.Rev. 1165, 1192 (1967)). In other words, for purposes of determining whether a 'taking' of the plaintiffs' 'property' has occurred, the proper inquiry is what constitutes the relevant 'property'?

This is known to courts and commentators as the denominator problem, "denominator" referring to the parcel that is considered in measuring lost value. *See* Marc R. Lisker, *Regulatory Takings and the Denominator Problem*, 27 Rutgers L.J. 663, 666 (1996). Identifying the denominator parcel is no easy task. *See Palazzolo*, 533 U.S. at 631, 121 S.Ct. at 2464–65, 150 L.Ed.2d at 615–16; *Lucas, supra*, 505 U.S. at 1017 [1018] n. 7, 112 S.Ct. at 2894, 120 L.Ed.2d at 813–14.[6] Nevertheless, we proceed with the benefit of the cases that have preceded our foray here.

■■■■ In defining the proper denominator parcel, the task is to "identify the parcel as realistically and fairly as possible" in light of the regulatory scheme and factual circumstances. *Ciampitti v. United States*, 22 Cl. Ct. 310, 319 (Cl.Ct.1991); *see also Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1181 (Fed.Cir.1994) ("Our precedent displays a flexible approach, designed to account for factual nuances"). Courts typically reject the so-called "conceptual severance" theory—the notion that whole units of property may be divided for the purpose of a takings claim. *See Penn Central*, 438 U.S. at 130, 98 S.Ct. at 2662, 57 L.Ed.2d at 652 (" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated"). Additionally, the interest at stake must always be considered in light of established principles of state property law. As the Supreme Court mused in *Lucas*,

[t]he answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the State's law of property—*i.e.*, whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which the takings claimant alleges a diminution in (or elimination of) value.

505 U.S. at 1017 [1018] n. 7, 112 S.Ct. at 2894, 120 L.Ed.2d at 813–14. However, since 2001, the fact that an owner acquires property after a regulation has been enacted does not necessarily bar a claim that the regulation has effected a taking. *Palazzolo*, 533 U.S. at 630, 121 S.Ct. at 2459, 150 L.Ed.2d at 615.

### C.

■■■ One of the grounds on which the district court based its decision was that the transfer to Beach Brothers had, essentially, no effect:

the transfer to Beach Brothers, Inc. was to benefit the Simpsons as the owners of the upland parcel. The transfer was designed to protect the Simpsons, who retained record title ownership of the upland parcel, from liability claims which might arise out of ownership of the waterward parcel. Furthermore, the transfer of the waterward parcel was to family members, for purposes of estate planning, presumably to benefit the family, including the Simpsons as owners of the upland parcel. There is nothing in the record to indicate that the transfer of record title ownership has in any way changed the Simpsons' continued use of the beachfront parcel.

In short, [the] Simpsons have unequivocally established on the record that, even though the parcels are now held in different record title ownership, the real property is in fact owned and operated as a conceptual and practical unit.

The court's statement, that the transfer was to "family members," is not quite accurate.

---

6. Indeed, even commentators have experienced much difficulty in ascertaining any definitive test for defining the denominator parcel. *See* John E. Fee, Comment, *Unearthing the Denominator in*

*Regulatory Taking Claims*, 61 U. Chi. L.Rev. 1535 (1994) (noting courts' failure to explain the basis for methodology used in analysis and inconsistent application of factors).

Similarly, the court's statement, that the property "is in fact owned and operated as a conceptual and practical unit" is also at least partially inaccurate. The record does support a finding that the Simpsons still use the property. However, it is undisputed that the parcel was deeded to, and legal ownership remains solely in, Beach Brothers, Inc., a corporation recognized under the laws of Idaho and therefore separate from its shareholders, *see Jolley v. Idaho Securities, Inc.,* 90 Idaho 373, 414 P.2d 879 (1966), and, more importantly, separate from Jack and Virginia Simpson. The district court's focus seemed to be on the Simpsons' historical and continued use of the waterward parcel and the upland parcel. But as mentioned above, Jack and Virginia Simpson no longer hold any interest in the waterward parcel. Beach Brothers has no interest in the upland parcel. The Simpsons' names will not be on a check from the City if a taking is found.

The City offers *Ciampitti v. United States, supra,* 22 Cl.Ct. 310, where the Court of Claims held that the entire 45–acre parcel (approximately 14 acres of which were wetlands) was the denominator parcel, where the purchaser treated all the lots involved as a single parcel for purchase and financing. In this case, the *Simpsons* treated the parcels as one for purchase (and presumably financing) but *Beach Brothers* has not, since it acquired only the waterward parcel. The City also contends that the waterward parcel serves to benefit, enhance and increase the value of the upland parcel. This is certainly a relevant factor. *See Ciampitti,* 22 Cl.Ct. at 318. However, any benefit the waterward parcel confers upon the upland parcel will not be seen by Beach Brothers.

On the record as it currently exists, the Simpsons deeded a separate parcel of property to a wholly separate entity. There is no allegation or evidence of an illegal split, and the only stated purposes for the transaction were estate planning and to avoid potential personal liability claims. We therefore believe that the record does not support the district court's conclusion that the denominator parcel consists of both the upland and waterward parcels. It was not proper, on the record before us, to summarily disregard the separate ownership of the parcels and define

Beach Brothers' constitutional rights in property based on a parcel in which that company has no interest and to which it is not legally connected.

We cannot say, however, that the transfer and fact of separate ownership by themselves necessarily end the inquiry. Indeed, the City has questioned the purpose of the transfer and we believe the circumstances of the transfer may be entirely relevant to the denominator inquiry. To explain: a rule that separate ownership is always conclusive against the government would be powerless to prevent landowners from merely dividing up ownership of their property so as to definitively influence the denominator analysis. It is not pure fantasy to imagine a scenario wherein halfway through a takings suit, Landowner agrees with Company to transfer a parcel of Beachacre—which appears, as the waterward parcel does here, to be separate from Landowner's other parcel—with a wink-and-a-nod agreement to transfer back after the suit or to jointly manage, use, and develop the property. As the Court of Claims explained in *Ciampitti, supra,* the purpose of the denominator inquiry is to define the property as realistically and fairly as possible in light of the factual circumstances. We cannot endorse a rule that turns a blind eye to all the relevant factual circumstances, including the purpose, character and timing of any transfer, especially one made during the course of a takings case.

**D.**

Since we vacate the district court's holding with regard to the regulatory takings claims, the City will have an opportunity on remand to present evidence in support of its contention that the mid-litigation transfer of the waterward parcel was accomplished for the purpose of creating an advantageous denominator. If the district court finds the transfer to Beach Brothers was a bona fide separation of ownership of the parcels and not primarily designed to influence the denominator analysis, the inquiry may stop there. If the court determines otherwise, the parties will have to present evidence of the relevant factors that guide the denomina-

tor inquiry. Since our cases have not squarely addressed the denominator question, we offer, for purposes of guidance to the district court, some other factors that may be relevant in the inquiry. We note, however, that the following factors are not the only factors to consider, and that the relative weight of any one factor will necessarily depend on the facts developed upon remand.

## 1.

Beach Brothers asserts that because the upland and waterward parcels are subject to different restrictions, the denominator should not include the upland parcel. For this proposition it relies on *Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374 (Fed.Cir. 2000). The parallels between this case and that case are not as close as Beach Brothers would like, but the principle is useful nonetheless. In *Palm Beach Isles Assocs.*, the landowner, PBIA, acquired 311.7 acres of property in 1956. A road split the property into two parcels: a 261–acre "upland" parcel on the east side of the road and a 50.7–acre parcel of shoreline wetlands and submerged land on the west. The 261–acre parcel was sold in 1968. PBIA sought a permit to develop the 50.7–acre parcel but the Army Corps of Engineers denied the permit under § 404 of the Clean Water Act. On appeal the government argued that the regulatory structure, the Rivers and Harbors Act, was in place before the 261–acre parcel was sold so it should be included in the denominator.

The Federal Circuit, however, disagreed. "The timing of property acquisition and development, compared with the enactment and implementation of the governmental regimen that led to the regulatory imposition" was but one factor to consider. *Palm Beach Isles Assocs.*, 208 F.3d at 1381. The court noted that unlike a case where the landowner had treated an entire parcel under one development plan, *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365–66 (Fed.Cir. 1999), PBIA "never planned to develop the parcels as a single unit." *Palm Beach Isles Assocs.* 208 F.3d 1374 at 1380. Additionally, the court viewed § 404 of the Clean Water Act, enacted after the sale of the 261–

acre parcel, as the relevant regulatory scheme, not the Rivers and Harbors Act: "[t]he regulatory imposition that infected the development plans for the 50.7 acres was unrelated to PBIA's plans for and disposition of the 261 acres on the ease side of the road." *Id.* Therefore, "[t]he development of [the 261–acre property] was physically and temporally remote from, and legally unconnected to, the 50.7 acres...." *Id.* Thus the proper denominator parcel was the 50.7–acre parcel.

Similarly, in *Loveladies Harbor, supra,* 28 F.3d 1171, cited by the City, the claimant sought a permit to develop a 12.5–acre parcel of property on Long Beach Island in New Jersey. That parcel was part of a 250–acre tract Loveladies acquired in 1958. One hundred ninety-nine acres of this 250–acre tract had been developed and mostly sold [7] before § 404 of the Clean Water Act became law. Sometime after the enactment of § 404, Loveladies obtained a permit from the state to develop 12.5 acres of the remaining 51 undeveloped acres. In exchange for the permit, it dedicated 38.5 of those 51 acres to open space. The Army Corps of Engineers denied Loveladies' permit, however, and the action was commenced. The government lost. On appeal, the court held the proper denominator was the 12.5–acre parcel, not the whole 250–acre parcel, as the government had contended. Key to the ruling was the fact that the 199 acres not included in the denominator had been developed prior to enactment of § 404—the regulation on which the permit denial was based. The court saw nothing improper about excluding land developed or sold before the relevant regulatory scheme came into being. The court refused to consider the 38.5 acres dedicated to the state, writing that "[i]t would seem ungrateful in the extreme to require Loveladies to convey to the public the rights in the 38.5 acres in exchange for the right to develop 12.5 acres, and then to include the value of the grant as a charge against the givers." 28 F.3d at 1181.

As the City points out, in *Palm Beach Isles Assocs.* and *Loveladies Harbor,* each property was affected by an intervening re-

7. When § 404 became law, all but 6.4 of the 199 acres had been sold.

striction to which the "separated" parcels were not subject. The timing of these restrictions was considered. But in each case, the courts refused to consider property that was subject to differing restrictions and was not in the landowner's ownership at the time of the permit denials. (In the case of *Loveladies Harbor*, the court even refused to consider some of the developed parcels the landowner still held.) In this case, the ordinances applied to the waterward parcel well before Beach Brothers acquired it. It has not been explained, however, how this fact favors treating both parcels as one. The parcels have *always* been subject to the differing restrictions. If an intervening regulation acts to separate parcels, we see no reason why one that has always been in place would not do the same.

When two or more parts of a property are subject to differing restrictions, the courts also consider the extent to which the property was intended to be developed as a whole. Take, for instance, *Walcek v. United States*, 49 Fed.Cl. 248 (Fed.Cl.2001), where one Delores Walcek (with her husband and other investors) purchased a 14.5–acre parcel intent on developing it. 13.2 acres of the 14.5 acres were federally-regulated wetlands. When denied a permit to build on the regulated portion, Mrs. Walcek and her partners sued. The court ruled there was no taking, based on several critical factors: the property was intended to be developed as a whole, it was contiguous, it was under common ownership, and it was unsubdivided. One may be able to infer from the court's opinion that the timing of the regulation might not necessarily carry much significance. The court noted that the case was not one like *Palm Beach Isles Assocs.*, writing that Mrs. Walcek's facts did not make her case one "in which uplands and the wetlands were zoned differently or intended to be developed separately." *Walcek*, 49 Fed.Cl. at 260. *See also Deltona Corp. v. United States*, 228 Ct.Cl. 476, 657 F.2d 1184, 1188 (1981) (developer's master plan envisioned community developed on 10,000–acre parcel, including wetlands, would be a "thoroughly integrated, unified whole"). Here, there was no intent to develop the parcels as a whole.

2.

Beach Brothers also contends that the waterward parcel has economic viability apart from the upland parcel and hence should be considered separate. In *Twain Harte Assocs., Ltd. v. County of Tuolumne*, 217 Cal. App.3d 71, 265 Cal.Rptr. 737 (Cal.Ct.App. 1990), the California Court of Appeal was presented with a takings challenge to a rezoning decision by Tuolumne County. The developer owned an 8.5–acre parcel zoned light commercial and built a shopping center and parking lot, which took up about 6.8 acres. A 1.7–acre plot within the 8.5–acre parcel remained undeveloped. The original developer sold and eventually the plaintiff acquired the whole 8.5–acre property. Sometime thereafter, the plaintiff sought county approval to split the 8.5–acre parcel into three lots: the 6.8 acres upon which the shopping center and parking lot sat; a 0.7–acre piece of the 1.7–acre undeveloped piece, and the remaining acre of that same piece. At the time of application, the 1.7–acre piece was still zoned light commercial but the plaintiff demonstrated no intent to develop either. The county denied the plaintiff's application for approval of the split, and sometime after that the county rezoned the 1.7–acre parcel to open space, whereupon the plaintiff sued.

The superior court ruled in the county's favor, but on appeal the appellate court adopted an economic independence test, and held that whether a taking occurred "entails assessment of the potential for development of each of the differently zoned properties, from the standpoint of both site economics and governmental cooperation." *Twain Harte*, 217 Cal.App.3d at 71, 265 Cal.Rptr. at 745. Thus the court ruled that to obtain summary judgment in its favor, the county had to demonstrate the 1.7–acre plot was not economically viable apart from the larger parcel; some development would be allowed on the 1.7–acre plot; or, that it would grant compensating densities or other allowances on the larger parcel to ameliorate the owners' loss of development on the smaller parcel. *Id.*

The court in *Twain Harte* looked to a Ninth Circuit case, *American Sav. & Loan Ass'n v. County of Marin*, 653 F.2d 364 (9th Cir.1981) for its economic viability test. In that case, the property owner owned two pieces of contiguous property on the edge of the San Francisco Bay. One parcel, the "Point," was roughly 20 acres, and contiguous to the other parcel, dubbed the "Spit," a 48–acre parcel created in a landfill operation. After the claimant bought the Spit and the Point, the county rezoned each, resulting in different density allowances. The landowner was denied a permit to build, so it sued and lost on summary judgment. On appeal, a panel of the Ninth Circuit ruled that where the Spit and the Point were treated differently for zoning purposes, and where evidence suggested the Spit had economic viability apart from the Point, such facts "tend[ed] to require that the zoning of the Spit be evaluated separately from that of the Point for taking purposes." 653 F.2d at 371. The court noted as potentially crucial the question whether the Spit and Point would be treated together in the development stage. For instance, the court noted the planning authorities might make some provision for density transfers, thereby alleviating the burden of the more restrictive zoning on the Spit by adding benefits to the Point. *Id.*

The economic independence test accounts for the very factors by which property is defined, at least in the takings context: use, economics, and regulation. We believe it is a fair and accurate factor to consider in determining whether the waterward parcel should be considered along with the upland parcel, or whether it should be considered separately in determining whether the Beach Brothers' rights in it have been taken. In this case, the waterward parcel appears to be economically viable apart from the upland parcel: the transfer of just the waterward parcel to Beach Brothers demonstrates this and indeed, one can hypothesize a market for a parcel having access to the lake, whatever

its development potential. In that sense, the City's setback rationale has no merit: unlike a setback requirement, affecting one part of a whole parcel, the regulation in this case affects an entire piece of property that is legally separate from the upland parcel.[8]

### 3.

Beach Brothers also argues that the presence of Lakeshore Drive between the parcels weighs in its favor and cites *Palm Beach Isles Assocs.* But, as the City points out, the presence of a road is not determinative and is but one factor to consider in evaluating the facts and regulatory scheme of the particular case. *See Ciampitti v. United States*, 22 Cl.Ct. 310. While the claimant in *Ciampitti* argued the road held some significance in *Palm Beach Isles Assocs.*, the court did not include that fact in its analysis. *Palm Beach Isles Assocs.*, 208 F.3d at 1381. It is therefore unclear what relative weight the court gave the road. At any rate, the road by itself cannot be considered to the exclusion of other relevant factors. *Ciampitti v. United States*, 22 Cl.Ct. at 319.

### 4.

Beach Brothers also argues that since the transfer to it, the property has been treated separately for tax purposes. This is true, and it is a factor courts consider in defining the denominator parcel. *See Karam v. Dep't of Envtl. Prot.*, 308 N.J.Super. 225, 705 A.2d 1221, 1228 (1998). And it is true that between 1995 and 1999, Kootenai County assessed both parcels as a whole. That fact certainly supports a finding in 1998 or 1999 that the parcels, then under common ownership, were a whole. However, beginning with the transfer to Beach Brothers, the County has assessed the waterward parcel separate from the upland parcel.

### 5.

The foregoing factors are provided for the district court's guidance in determining the

---

8. The other two alternatives provided to the county in *Twain Harte* do not apply. The ordinances make clear no development is allowed and, from Beach Brothers' standpoint, whether the Simpsons may be permitted to put fences on the upland parcel is totally irrelevant to its use

and enjoyment of the waterward parcel. And finally, the possibility of treating the parcels together under a comprehensive development scheme, *see American Sav. & Loan*, 653 F.2d at 371, is not possible since the upland and waterward parcels are not held by the same owner.

proper denominator parcel in the event that the court determines the transfer was made for the purpose of influencing the denominator analysis. The consideration of these factors is unnecessary if the court determines otherwise, in which event the waterward parcel and the denominator parcel will be one and the same. We vacate the district court's rulings on Beach Brothers' regulatory takings claims and remand for further analysis consistent with the foregoing.

### E.

■ Before departing the regulatory takings issue, it is appropriate to provide the district court with guidance on the issue of valuation of the taking, once the proper denominator has been determined. Different valuation rules apply, depending on whether the alleged regulatory taking is categorical or noncategorical. With regard to the categorical taking alleged here, the owner must show that the regulation has completely deprived him of all economically beneficial use of the property. *Lucas,* 505 U.S. at 1019, 112 S.Ct. at 2895, 120 L.Ed.2d at 815. As Justice O'Connor noted in *Lingle:*

We held in *Lucas* that the government must pay just compensation for 'total regulatory takings,' except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property.

544 U.S. at 538, 125 S.Ct. at 2081, 161 L.Ed.2d at 888.

■ With regard to a noncategorical taking, the owner must show "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle,* 544 U.S. at 540, 125 S.Ct. at 2082, 161 L.Ed.2d at 889. The district court must consider the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Id.* at 544 U.S.at 538–

39, 125 S.Ct. at 2081–2082, 161 L.Ed.2d at 888.

### V.

■ We next turn to the equal protection portion of the case, and Beach Brothers' claim that the City was enforcing the Shoreline Regulations against it and not against other landowners who were violating the ordinances. Congress created a right of action in any person who, by the conduct of an actor operating "under color of statute, ordinance, regulation, custom, or usage," has been deprived of any "rights, privileges, or immunities . secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. Beach Brothers argues that as a "class of one" it need only allege and prove that it is intentionally being singled out and treated differently based on a distinction that fails the rational basis test. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564–65, 120 S.Ct. 1073, 1074–75, 145 L.Ed.2d 1060, 1063–64 (2000); *Anderson v. Spalding,* 137 Idaho 509, 514, 50 P.3d 1004, 1009 (2002).[9]

When the Simpsons presented their equal protection claim as holders of the waterward parcel, the district court denied their claim, explaining that an affidavit demonstrated "other encroachments" within the 40–foot setback zone, but that the Simpsons' fence was the only fence within the setback zone. Accordingly, the district court wrote:

This just simply is not a case where all the beachfront owners have built cyclone fences down to the water, and the only action being instituted by the City to remove the cyclone fences is the one against Simpson. The facts just simply do not establish that Simpson is doing the same thing as everyone else, and only Simpson is faced with enforcement. Rather, the facts show that Simpson is in fact doing something that no one else is doing. The equal protection claim does not have any

9. In *Anderson,* the Court declined to hold that the subjective ill will of the employer constituted an arbitrary classification that failed the rational basis test. One, the Court doubted the vitality of the subjective ill-will theory and two, the Court also distinguished Anderson's facts from those present in *Ciechon v. City of Chicago,* 686 F.2d 511 (7th Cir.1982), saying that in *Ciechon,* there *was* a clear-cut difference in treatment of persons identically situated, but that in the case before it, there was no such difference. The Court was also hesitant to assert itself into the "morass of subjectivity in employment decisions." *Anderson,* 137 Idaho at 515, 50 P.3d at 1005.

factual basis as to fences within the 40 foot setback zone.

When Beach Brothers presented this same claim, the City again moved for summary judgment and the district court dismissed its claim on the same grounds.

The district court appears to have disposed of the equal protection claim because cyclone fences are different from the other encroachments. The ordinances, however, prohibit all structures. Distinguishing between some encroachments and others based on type, when all are prohibited, seems a bit narrow in light of an allegation of unequal protection.

It does not appear that the district court addressed the class-of-one elements. Nor does it appear from either party's memoranda supporting their respective positions that the equal protection claim regarding the waterward fences was placed in issue for purposes of the motion for summary judgment. The City declined to address the claim because the district court had, before Beach Brothers entered the case, deemed it meritless as to the Simpsons. The City, however, presented no res judicata or collateral estoppel arguments that the determination as to the Simpsons should apply to Beach Brothers. Accordingly, this claim was not properly before the court and hence not properly dismissed.

### VI.

■ Beach Brothers also appealed two other rulings. Beach Brothers demanded a jury trial on its inverse condemnation claims, which the district court rejected. The company contended the Shoreline Regulations constituted a taking and thus violated their rights to due process. The district court dismissed this claim, as well.

■ The district court was correct on both counts. First, the question whether a regulatory taking has occurred is committed to the trial court; just compensation is a matter for the jury. *Covington v. Jefferson County, supra,* at 780, 53 P.3d at 831. Second, Beach Brothers has made no showing that the Shoreline Regulations do not serve a reasonably conceivable, legitimate state interest. *See Bradbury v. Idaho Judicial*

*Council,* 136 Idaho 63, 69, 28 P.3d 1006, 1012 (2001). And though the company discusses its due process claims in connection with the alleged taking of the property, as we noted above, *Lingle* makes clear that due process and takings claims are different animals. Thus, Beach Brothers' due process claims must fail.

### VII.

The district court's ruling with respect to the timeliness of Beach Brothers' counterclaims is reversed. The rulings relating to Beach Brothers' takings and equal protection claims are vacated. The rulings regarding the demand for jury trial, the due process claims, and the motion to disqualify are affirmed. The case is remanded to the district court for proceedings consistent with this opinion, i.e., the court will need to determine whether a categorical regulatory taking occurred by virtue of the Shoreline Regulations, whether a noncategorical regulatory taking occurred by virtue of the Shoreline Regulations, and whether Beach Brothers has asserted a viable "class of one" claim under 42 U.S.C. § 1983.

Chief Justice SCHROEDER and Justice BURDICK concur.

Justice EISMANN, concurring in part and dissenting in part.

I concur in Parts II, and V of the majority opinion.

With respect to Parts III and IV, I agree that the district court misunderstood the applicable law in its analysis of the takings claims, and its grant of summary judgment must be vacated. I write because the majority creates new law to permit the government to take private property without paying compensation.

### A. Are the Takings Claims Time Barred?

I agree that under *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), the takings claims are not time barred. The district court's holding to the contrary must be reversed.

**B. Is the Takings Claim Ripe for Review?**

1. A regulatory takings claim is not ripe for review if the property owner has not utilized available procedures to obtain a variance from the regulations. The Shoreline Regulations adopted by Ordinance No. 1722 are currently codified as Sections 17.08.200 through 17.08.255 of the Coeur d'Alene Municipal Code.[1] Section 17.08.245 provides, "Construction within forty feet (40') of the shoreline shall be prohibited."[2] It is undisputed that portions of the two fences constructed on the property now owned by the Beach Brothers, Inc., (Beach Brothers) are within that forty-foot area. Under the Shoreline Regulations, the fences could be permitted to remain within forty feet of the shoreline only if a variance were granted. Section 17.08.255 provides, "A variance may be granted from any provision of the shoreline regulations, pursuant to Article VI of Chapter 17.09, and provided that the variance conforms to the stated purpose of the shoreline regulations."

The United States Supreme Court has held a claim that government regulations have effected a taking of a property interest is not ripe if the property owner failed to utilize available procedures to obtain a variance from the regulations. *Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). It is undisputed that no variance was sought in this case to permit construction of the fences at issue. The landowner need not seek a variance, however, if the governmental agency would not have any discretion to grant it. *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). In this case, the application for a variance would be made to the planning commission, which could grant the variance as long as it "conforms to the stated purpose of the shoreline regulations." Coeur d'Alene Mun.Code §§ 17.08.255 & 17.09.600 *et seq.*

2. In order to reach the result that no variance could be granted, the majority holds that two ordinances are, simultaneously, in conflict with each other and not in conflict with each other. In 1928, the City adopted Ordinance No. 676, which banned all buildings or structures located east of 11th Street and south of Lakeshore Drive. The waterfront parcel owned by Beach Brothers is within that area, but the parcel owned by the Simpsons is not.[3] In 1982 the City adopted Ordinance No. 1722, which imposed "Shoreline Regulations" over an area that included, but was larger than, the area covered by Ordinance No. 676, as amended. Ordinance No. 1722 also provided, "All ordinances and parts of ordinances in conflict with this ordinance are hereby repealed."

The majority states, "The plain language of those ordinances grants no discretionary authority to City officials to allow a fence on Sanders Beach, particularly within 40 feet of the shoreline." The variance provision in the Shoreline Regulations of Ordinance No. 1722 does not limit the area in which a variance can be granted. It states, "A variance may be granted from *any* provision of the Shoreline Regulations, pursuant to Section 17.09.600, and provided that the variance conforms to the stated purpose of the Shoreline Regulations." (Emphasis added.) The word "any" means any.

The majority holds that the variance provision in Ordinance No. 1722 does not apply because it is in conflict with Ordinance No. 676, which did not include any provision for a variance. The majority also holds, however, that Ordinance No. 676 was not repealed by the adoption of Ordinance No. 1722 because there is no conflict between the two Ordinances. How the two Ordinances can be in conflict with each other and not in conflict

---

1. Section 17.08.205 states that the Shoreline Regulations consist of Sections 17.08.200 through 17.08.299, but at present the section numbers end at 17.08.255.

2. The ordinance also provides that there can be construction within forty feet of the shoreline "as provided for in Section 17.08.250," but that code section would not permit erection of the fences at issue in this case.

3. The area covered by Ordinance No. 676 was later amended by Ordinance No. 1197 adopted in 1965, but that amendment does not affect the two parcels at issue in this case.

with each other at the same time escapes me. There are other conflicts between the two Ordinances in addition to the conflicting provisions regarding the availability of a variance.

First, Ordinance No. 676 prohibits the erection of all structures south of Lakeshore Drive within the covered area. Ordinance No. 1722 does not prohibit the erection of all structures south of Lakeshore Drive. It only prohibits construction within forty feet of the shoreline. The district court found that a portion of the Beach Brothers's property is located south of Lakeshore Drive but outside the 40 foot setback.

Second, Ordinance No. 676 *does not* provide any exception for replacing or maintaining public facilities or structures. Ordinance No. 1722 *does* provide an exception for replacing or maintaining essential public services (such as streets, sidewalks, parking lots, street lights, fire hydrants and underground facilities).

Third, Ordinance No. 676 prohibits *maintenance* of any structure south of Lakeshore Drive within the covered area. Ordinance No. 1722 does not prohibit replacement or maintenance of certain existing private structures (shoreline protective structures, fences, hedges and walls in their present location).

Fourth, Ordinance No. 676 does not provide for any exceptions to its prohibitions. Ordinance No. 1722 provides that, in addition to the above exceptions, the prohibition on construction within forty feet of the shoreline does not apply in a C–34 Zoning District.

Additionally, in 1993 the City codified its ordinances in the Coeur d'Alene Municipal Code. That Municipal Code includes all regulatory and penal ordinances. Section 1.01.030 provides, "This Code consists of all the regulatory and penal ordinances and certain of the administrative ordinances of the City of Coeur d'Alene, codified pursuant to the provisions of Sections 50–903 through 50–906 of the Idaho Code Annotated." Ordinance No. 676 was a regulatory ordinance. It regulated the erection and maintenance of any structures within the area designated in the Ordinance.

Ordinance No. 676 is a penal ordinance. It provided a fine of up to $100 upon any conviction for violating the Ordinance. *Ordinance No. 676 was not included in the codification.*

3. **The majority usurps the authority of the City to determine what variances are permitted.** Finally, the majority holds that the erection of any fences to protect private property from trespassers would, as a matter of law, not conform to the stated purpose of the Shoreline Regulations. It states, "[I]t appears to be fairly obvious that the fence is violative of both the purpose of, and prohibitions contained in, the Shoreline Regulations." The issue is not whether the erection of these particular chain link fences would fail to conform to the stated purpose of the regulations. If it granted a variance, the planning commission could include reasonable conditions regarding the type of fencing permitted. Rather, the holding would have to be that no structure designed to keep out trespassers would conform to that purpose. The stated purpose of the regulations is "to protect, preserve and enhance visual resources and public access of the Coeur d'Alene shoreline." Coeur d'Alene Mun.Code §§ 17.08.255. The fences at issue were erected to keep people from trespassing on private property. To hold that fencing erected for that purpose cannot, under any circumstances, conform to the purpose of the Shoreline Regulations, the purpose of those Regulations would have to be to require landowners to submit to the physical occupation of their land. Although that may have been an unstated purpose for enacting the Shoreline Regulations, it is not their stated purpose. Any such purpose would invite close scrutiny under the Takings Clause. As the United States Supreme Court stated in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019 n. 8, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798, 815 (1992),

> Though our prior takings cases evince an abiding concern for the productive use of, and economic investment in, land, there are plainly a number of noneconomic interests in land whose impairment will invite exceedingly close scrutiny under the Takings Clause. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458

U.S. 419, 436, [102 S.Ct. 3164, 3176–77, 73 L.Ed.2d 868, 882–83] (1982) (interest in excluding strangers from one's land).

In my opinion, since a variance procedure exists, Beach Brothers should be required to request a variance and the City should be given an opportunity to consider the request and possibly avoid the need for this litigation.

The fact that the City has brought this lawsuit does not mean that the planning commission would not grant any variance, or that the city council would overturn any variance granted. The City has the right to require compliance with the procedures set forth in the Shoreline Regulations, including the requirement that a landowner desiring to erect structures in violation of the Regulations must first seek a variance. The City may also have erroneously assumed, as it argued, that any takings claim arose in 1928 when it adopted Ordinance No. 676 and that any takings claim was therefore barred by the statute of limitations.

**C. The Majority Erroneously Allows the Government to Take a Purchaser's Real Property if the Seller Had an Improper Motive in Selling the Property.**

Assuming that no variance would be granted to erect any structures on the Beach Brothers's property, then there is an issue of whether the property has been taken under *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798, 815 (1992). Lucas and others had developed a subdivision on a barrier island off the coast of South Carolina, and Lucas had purchased for himself two of the lots located about 300 feet from the beach. He intended to erect a single-family residence on each lot, but a subsequently enacted statute prohibited "the construction of any permanent structure (including a dwelling), save a small deck or walkway," *Lucas v. South Carolina Coastal Council,* 304 S.C. 376, 404 S.E.2d 895, 896 (1991). The United States Supreme Court held that the statute prohibiting construction on the lots constituted a taking because it deprived Lucas of "all economically beneficial uses in the name of the common good, that is, to leave his prop-

erty economically idle," *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798, 815 (1992).

The Takings Clause is not limited to protecting only economic development of real property. It also protects noneconomic uses, such as excluding strangers from one's own land. As the Supreme Court explained in *Lucas:*

Justice STEVENS similarly misinterprets our focus on "developmental" uses of property (the uses proscribed by the Beachfront Management Act) as betraying an "assumption that the only use of property cognizable under the Constitution are *developmental* uses." We make no such assumption. Though our prior takings cases evince an abiding concern for the productive use of, and economic investment in, land, there are plainly a number of noneconomic interests in land whose impairment will invite exceedingly close scrutiny under the Takings Clause. See, *e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 436, [102 S.Ct. 3164, 3176, 73 L.Ed.2d 868, 882–83] (1982) (interest in excluding strangers from one's land).

*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019 n. 8, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798, 815 (1992) (Emphasis in original, internal citation omitted). Likewise, in *Dolan v. City of Tigard,* 512 U.S. 374, 393, 114 S.Ct. 2309, 2320, 129 L.Ed.2d 304, 321 (1994), the Supreme Court stated, "As we have noted, this right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" The Beach Brothers's desire to exclude others from its real property is also entitled to protection under the Takings Clause.

The district court erroneously equated beneficial use with market value. It held that because the record indicated the Beach Brothers's property retained some market value (someone would pay money to acquire it), the City's regulations had not deprived the Beach Brothers of all economically beneficial use of the property. Except for unusual circumstances such as contamination by

toxic waste, all real property has a market value. It is hard to imagine any parcel of unpolluted real property that someone would not pay $1.00 to acquire. The issue is whether the government has deprived the landowner of all economically beneficial uses of his property, not whether the landowner could still sell the property to someone else. Because a *Lucas* claim requires a showing that the government regulation has deprived the landowner of *all* economically beneficial uses of his property, the first issue is often to identify the relevant property.

**1. The majority creates new law to circumvent the Takings Clause.** There are two parcels of property involved in this case. One is the Simpsons' residence, located north of Lakeshore Drive. The other is the Beach Brothers's lakefront property located south of Lakeshore Drive. The district court held that the two properties should be considered as one when analyzing whether the Shoreline Regulations constituted a taking of the Beach Brothers's property. I agree that the district court clearly erred in its analysis.

The majority holds that even if Beach Brothers is the bona fide owner of the lakefront parcel, the trial court could still aggregate the Beach Brothers's property with the Simpsons' property in its takings analysis if the district court found that the sale was "primarily designed to influence the denominator analysis." The purpose of that aggregation is to defeat the Beach Brothers's taking claim and to enable the City to ban all development of the Beach Brothers's property. Thus, the majority holds that if a seller had an improper motive for selling real property, the government can take that property from the purchaser without being required to pay compensation. Not surprisingly, the majority cannot cite any authority supporting that proposition.

Although it cites *Ciampitti v. United States,* 22 Cl.Ct. 310 (1991), that case did not address the issue, nor is it even binding authority, unless you happen to be litigating in the court of claims. As noted by the Michigan Supreme Court, "Although state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts." *Abela v. General Motors Corp.,* 469 Mich. 603, 677 N.W.2d 325, 327 (Mich.2004).

The United States Supreme Court has never held that a takings claim asserted by the buyer of real property can be defeated if the seller of the property had an improper motive for parting with the property. The Supreme Court has addressed, however, a similar issue.

In *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), the Supreme Court addressed whether a regulatory takings claim could be denied on the basis that the landowner knew of the government regulations before purchasing the property at issue. In holding that it could not, the Supreme Court stated,

Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

*Id.* at 627, 121 S.Ct. at 2462–63, 150 L.Ed.2d at 613. "A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." *Id.* at 628, 121 S.Ct. at 2463, 150 L.Ed.2d at 613–14. The Court also said, "The State's rule would work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation. The State may not by this means secure a windfall for itself." *Id.* at 627, 121 S.Ct. at 2463, 150 L.Ed.2d at 613.

In *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the Nollans had an option to purchase beachfront property that was conditioned upon their promise to demolish and replace the existing bungalow on the property. They applied for a permit from

the California Coastal Commission to demolish the bungalow and replace it with a three-bedroom house. The Commission granted the permit subject to the Nollans recording a deed giving the public an easement across a portion of the beachfront property. While the issue of whether the Commission could condition the permit upon the granting of the easement was being appealed, the Nollans purchased the property. Thus, they purchased their property with full knowledge that the Commission would require them to grant an easement to the public as a condition of demolishing and replacing the bungalow. The United States Supreme Court held that if California "wants an easement across the Nollans' property, it must pay for it." 483 U.S. at 842, 107 S.Ct. at 3151, 97 L.Ed.2d at 692. The dissenters would have denied the Nollans any recovery on the ground that before they purchased the property they had full knowledge that the building permit would be conditioned upon their granting the easement. The *Nollan* majority rejected that argument. *Palazzolo v. Rhode Island,* 533 U.S. 606, 629, 121 S.Ct. 2448, 2463–64, 150 L.Ed.2d 592, 614–15 (2001).

Thus, the Beach Brothers's takings claim could not be denied on the ground that it knew of the City's ordinances and the pending litigation prior to purchasing the waterfront parcel of property. The majority holds, however, that the Beach Brothers's takings claim could be denied if the Simpsons sold the parcel with the wrong motive. The supposedly improper motive of wanting to enhance a takings claim by selling a parcel of real property is no different than buying real property with notice of existing land-use restrictions and then bringing a takings claim based upon those restrictions.

The majority cannot cite a single case in which a purchaser's property was pretended to be still owned by the seller in order to evaluate the purchaser's regulatory takings claim. When government regulations prohibit development on a portion of an owner's property, the owner often argues that the court should pretend that the regulated portion has been separated from the remainder and consider it separately. This argument is called "conceptual severance." *See, Tahoe-*

*Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 331, 122 S.Ct. 1465, 1483–84, 152 L.Ed.2d 517, 546 (2002). The majority has created a new doctrine that would be "conceptual aggregation"—pretending that two separately owned parcels of property are in common ownership when analyzing a regulatory takings claim as to one of the parcels.

Another problem with the majority's newly-created conceptual aggregation rule is that motive is difficult to determine. A trial court could easily infer the allegedly improper motive in order to circumvent the protection of the Takings Clause. Thus, I agree that the district court erred by considering both parcels as one when analyzing the takings claim. I disagree that the majority's newly created doctrine of conceptual aggregation is consistent with the decisions of the United States Supreme Court.

2. **The majority has an aversion to opinions of the United States Supreme Court.** The United States Supreme Court has not thoroughly addressed the issue of what property should be considered as the proper denominator in the takings fraction. As it stated in *Palazzolo v. Rhode Island,* 533 U.S. 606, 631, 121 S.Ct. 2448, 2464–65, 150 L.Ed.2d 592, 616 (2001) (internal citations omitted), "Some of our cases indicate that the extent of deprivation effected by a regulatory action is measured against the value of the parcel as a whole, but we have at times expressed discomfort with the logic of this rule, a sentiment echoed by some commentators." The Supreme Court has never held, however, that two separately owned parcels can be aggregated when determining the proper denominator. Language in two of its opinions indicates that they cannot.

In *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 331–32, 122 S.Ct. 1465, 1483–84, 152 L.Ed.2d 517, 546 (2002), the Supreme Court stated, "An interest in property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest." The Simpsons' property is not included within the metes and bounds description of the Beach Brothers's property.

Interestingly, the majority quotes from the Ninth Circuit's opinion in *Tahoe–Sierra*, but does not address the later opinion of the United States Supreme Court.

The *Penn Central* case also provides some guidance as to whether different properties can be aggregated to defeat a takings claim. The Penn Central Transportation Company (Penn Central) owned Grand Central Terminal (Terminal), which had been designated as a landmark under New York City's Landmarks Preservation Law. That Law required approval from the Landmark Preservation Commission (Commission) before altering the landmark's exterior architectural features or constructing any exterior improvement on the landmark. After being denied approval to construct an office building exceeding fifty stories in height above the Terminal, Penn Central sued. It alleged that that the restrictions upon its development plans constituted a taking of its property—specifically the airspace above the Terminal. The Supreme Court rejected that argument, in part because the Commission had not indicated it would prohibit any construction above the Terminal and Penn Central had not sought approval to construct a smaller structure.

One of the issues in *Penn Central* was identifying the property at issue. "The Terminal is located in midtown Manhattan. Its south façade faces 42d Street and that street's intersection with Park Avenue. At street level, the Terminal is bounded on the west by Vanderbilt Avenue, on the east by the Commodore Hotel, and on the north by the Pan–American Building." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 115, 98 S.Ct. 2646, 2654–55, 57 L.Ed.2d 631, 642–43 (1978). Penn Central owned the Pan–American Building and the Commodore Hotel, and it also owned the Barclay, Biltmore, Roosevelt and Waldorf–Astoria Hotels in the vicinity of the Terminal, and other buildings. *Id.* When identifying the parcel at issue, the Supreme Court stated, "In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole—*here, the city tax block designated as the 'landmark site.'* " *Id.* at 130–31, 98 S.Ct. at 2662–63, 57 L.Ed.2d at 652–53. (Emphasis added). Even though Penn Central owned other properties adjoining the Terminal, only the Terminal was identified by the Supreme Court as the parcel of property at issue when analyzing the takings claim.

In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016 n. 7, 112 S.Ct. 2886, 2894, 120 L.Ed.2d 798, 813 (1992), the United States Supreme Court commented on the issue of identifying the relevant parcel in a situation where only a portion of a larger tract was subject to the challenged government regulations. Although it noted that the issue had not yet been resolved, it stated that it would be an extreme and unsupportable view to hold that the diminution in a particular parcel's value produced by a municipal ordinance should be considered in light of the total value of the takings claimant's other holdings in the vicinity. The Court stated:

Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole. (For an extreme—and, we think, unsupportable—view of the relevant calculus, see *Penn Central Transportation Co. v. New York City*, 42 N.Y.2d 324, 333–334, 397 N.Y.S.2d 914, 920, 366 N.E.2d 1271, 1276–1277 (1977), aff'd, 438 U.S. 104, [98 S.Ct. 2646, 57 L.Ed.2d 631] (19787), where the state court examined the diminution in a particular parcel's value produced by a municipal ordinance in light of total value of the takings claimant's other holdings in the vicinity.) Unsurprisingly, this uncertainty regarding the composition of the denominator in our "deprivation" fraction has produced inconsistent pronouncements by the Court.

If it was an extreme and unsupportable view to assert that the proper denominator in *Penn Central* should include both the property regulated and adjoining property owned by the same entity, then it is even beyond extreme and unsupportable to assert that the proper denominator can include nearby property owned by someone else.

To arrive at this result, the majority relies upon a general statement in a 1991 opinion of the Court of Claims and ignores contrary language in more recent opinions of the United States Supreme Court. As I stated previously, opinions of the Court of Claims are not binding authority on this Court, but opinions of the United States Supreme Court are. I believe we must follow them. Therefore, I cannot agree to the "conceptual aggregation" doctrine created by the majority in this case.

Justice TROUT concurs.